**Charles SILSBY, et al., Plaintiffs,**

v.

**Carl ICAHN, et al., Defendants.**

**No. 12 Civ. 2307(JGK).**

United States District Court,
S.D. New York.

Signed April 30, 2014.

Nicholas Ian Porritt, Levi & Korsinsky LLP, Washington, DC, Richard William Gonnello, Emily C. Komlossy, Francis Paul McConville, Faruqi & Faruqi, LLP, New York, NY, for Plaintiffs.

Herbert Beigel, Herbert Beigel & Associates, LLC, Tucson, AZ, Robert R. Viducich, Law Office of Robert R. Viducich, Douglas P. Baumstein, Glenn Kurtz, White & Case LLP, New York, NY, for Defendants.

### OPINION AND ORDER

JOHN G. KOELTL, District Judge:

This is an alleged securities fraud action brought on behalf of a proposed class of investors in Dynegy, Inc. ("Dynegy"). The lead plaintiff, Stephen Lucas, brings a consolidated putative class action suit on behalf of individuals who purchased securities of Dynegy between July 10, 2011 and March 9, 2012 (the "Class Period"). The plaintiffs allege that various defendants made material omissions in connection with Dynegy's attempt to restructure its assets in 2011. The plaintiffs allege that the asserted omissions violate Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder, 17 C.F.R. 240.10b–5. The plaintiffs also allege that various Dynegy officers, directors, and shareholders are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The defendants move to dismiss the Amended Class Action Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). This Court has jurisdiction over the alleged Securities Exchange Act violations pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. For the reasons explained below, the defendants' motion to dismiss is **granted** and the current complaint is **dismissed.**

### I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir.2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff[s] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil

Procedure and of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *ATSI*, 493 F.3d at 99; *see also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F.Supp.2d 395, 401 (S.D.N.Y.2011).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002). The Court can take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 569–70, 2013 WL 5878814, at *1–2 (S.D.N.Y.2013).

## II.

The following facts are undisputed or accepted as true for purposes of the defendants' motion to dismiss. Dynegy is a publicly traded company and the third largest independent power producer in the United States. (Amended Class Action Complaint ("Am. Compl.") ¶ 3.) Dynegy Holdings, Inc. ("Dynegy Holdings") is a direct and wholly-owned Dynegy subsidiary that, until September 1, 2011, owned all of Dynegy's operations. (Am. Compl. ¶¶ 4, 29.)

### A.

In 2010, Dynegy began experiencing severe financial difficulties. In October of that year, Dynegy disclosed that its "substantial leverage and forecasted negative free cash flow [were creating] a very challenging liquidity position over time" and that "[a]bsent significant improvements in BOTH commodity and financial/capital markets, operating as a stand-alone company [would involve] substantial risk to Dynegy stockholders." (Am. Compl. ¶ 34 (second alteration in original).) In its 2010 Annual Report, Dynegy disclosed that it and Dynegy Holdings had suffered net losses of $234 million and $242 million, respectively, in fiscal year 2010. (Am. Compl. ¶ 33.) The 2010 Annual Report stated that Dynegy's substantial debts might preclude it from servicing its financial obligations and also included a going-concern qualification from Dynegy's auditors, who expressed doubt about Dynegy's ability to continue as a going concern. (Am. Compl. ¶ 33.)

In response to its financial difficulties, Dynegy created a Financial Restructuring Committee ("FRC") composed of several of Dynegy's directors. (Am. Compl. ¶¶ 26, 41.) The FRC's purpose was to conduct "a comprehensive review of Dynegy's vari-

ous restructuring alternatives, including, . . . possible changes to the capital structure of Dynegy." (Declaration of Douglas Baumstein ("Baumstein Decl."), Ex. 1 at 18; *see also* Am. Compl. ¶ 41.) By May 15, 2011, the FRC had "devised a multi-step plan to reorganize Dynegy's business segments and reorganize and restructure its debts." (Am. Compl. ¶ 43.) Dynegy's Board of Directors considered the FRC's restructuring plan at a meeting on May 18, 2011, and continued discussing the plan at subsequent meetings on June 15, 2011, June 28, 2011, and August 4, 2011. (Am. Compl. ¶ 43.)

### B.

On July 10, 2011, Dynegy issued a press release announcing that it would refinance its senior secured credit lines by the end of July, 2011. (Am. Compl. ¶ 62.) Dynegy described the refinancing as "the initial step in the Company's operating and financial restructuring," and represented that the refinancing was intended to "provide a solid foundation for Dynegy to begin addressing the financial challenges that have been magnified by an environment of low commodity prices." (Am. Compl. ¶ 62.) Dynegy also represented that "[t]he new financings, accompanied by the modification of the Company's asset ownership structure," would, among other things, "improve Dynegy's financial condition." (Am. Compl. ¶ 62.) Dynegy also stated that the FRC and the Board of Directors would "continue to work with [Dynegy's] advisors in connection with additional potential debt restructuring activities, which may include direct or indirect transfers of equity interests of [Dynegy Holdings] . . . and/or further reorganizations of [Dynegy] and/or various of its subsidiaries." (Am. Compl. ¶ 63.) In public disclosures filed with the SEC on July 11, 2011, Dynegy further disclosed that it might, after the refinancing was complete, "engage in

transactions that increase the likelihood of [the Company's] estate or creditors challenging the [refinancing]." (Baumstein Decl., Ex. 2, Executive Summary ("Exec. Summ.") at 6.)

To facilitate its refinancing efforts, Dynegy attempted to reorganize its most valuable assets into "ring-fenced" silos, that is, into entities that would be protected from creditors in the event that Dynegy Holdings declared bankruptcy. (Am. Compl. ¶ 44.) This restructuring effort, (the "First Step Restructuring"), required transferring ownership of the Company's coal-powered facilities from Dynegy Holdings to Dynegy Coal Holdco, LLC ("CoalCo") and transferring ownership of the Company's gas-powered facilities from Dynegy Holdings to Dynegy Gas Holdco, LLC ("GasCo"). (Am. Compl. ¶ 44.) Dynegy Holdings would retain indirect ownership of both new entities through a newly incorporated holding company called Dynegy Gas Investments, LLC ("Dynegy Investments"). (Am. Compl. ¶ 44.)

On July 22, 2011, various creditors attempted to enjoin Dynegy's First Step Restructuring in the Delaware Court of Chancery. (Am. Compl. ¶ 66.) The plaintiff-creditors asserted claims for breach of contract and fraudulent transfer in the Delaware action. (Am. Compl. ¶ 66.) The court denied the creditors' application to enjoin the restructuring, and Dynegy completed the First Step Restructuring on August 5, 2011. (Am. Compl. ¶ 69; Baumstein Decl., Ex. 3 at 13.)

Dynegy disclosed the First Step Restructuring in its August 2011 Quarterly Report to the Securities and Exchange Commission ("SEC"). (Am. Compl. ¶ 72.) The Quarterly Report described each transaction involved in the First Step Restructuring and stated:

The August 2011 reorganization represents [Dynegy's] first step in addressing [Dynegy's] liquidity concerns. Over the next eighteen months ..., [Dynegy] may participate in additional debt restructuring activities, which may include direct or indirect transfers of [Dynegy's] subsidiaries' equity interests ... and/or further reorganizations of [Dynegy's] subsidiaries as well as other similar initiatives.

(Am. Compl. ¶ 72.)

## C.

On September 1, 2011, Dynegy executed the next step in its restructuring, acquiring CoalCo from Dynegy Investments in exchange for an illiquid unsecured financial instrument called an undertaking (the "undertaking"). (Am. Compl. ¶ 51.) According to Dynegy, CoalCo had a fair value of approximately $1.25 billion, and Dynegy represented that it provided "[t]his value ... to [Dynegy Investments] through ... the issuance of an undertaking to make proportionate payments at the times that Dynegy Holdings is obligated to make payments of principal and interest" under $1.1 billion of notes due in 2019, and $175 million of notes due in 2026. (Am. Compl. ¶ 77.) The undertaking thus required that Dynegy make a stream of designated payments on debt held by Dynegy Holdings without requiring that Dynegy assume any of the debt held by Dynegy Holdings. (*See* Declaration of Nicholas Porritt ("Porritt Decl."), Ex. A at 7.)

After Dynegy and Dynegy Investments completed their exchange, Dynegy Investments assigned the undertaking to Dynegy Holdings in exchange for a $1.25 billion promissory note. (Am. Compl. ¶ 52.) In connection with the assignment, the undertaking was amended to reduce Dynegy's payment obligations under the undertaking in the event that Dynegy acquired or retired any of the debt held by Dynegy Holdings. (Am. Compl. ¶¶ 52–53.) However, Dynegy ultimately declined to "relieve Dynegy Holdings of any debt." (Porritt Decl., Ex. A at 7.)

Dynegy announced the transactions executed in connection with the transfer of CoalCo (the "CoalCo transfer") on September 2, 2011 and disclosed the relevant documents to the SEC on September 8, 2011. (Am. Compl. ¶ 77; Baumstein Decl., Ex. 4 at 3–4.) In additional disclosures to the SEC, made on September 15, 2011, Dynegy stated that "[i]t is possible that [Dynegy's] creditors and/or other parties may seek to assert a variety of claims against Dynegy ... challenging some or all of the transactions ... under state or federal law for, among other things, breach of contract, [and] fraudulent transfer or preference...." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.) Dynegy also described the potential remedies that might be awarded to litigants who prevailed on claims that the CoalCo transfer was unlawful, including disgorgement and the transfer of CoalCo back to Dynegy Investments. (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.) Dynegy cautioned that "no assurance [could] be provided that any such litigation would be resolved in [Dynegy's] favor." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)

## D.

On November 7, 2011, Dynegy Holdings filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. (Am. Compl. ¶ 59.) The bankruptcy court subsequently granted a motion to appoint a Chapter 11 examiner for purposes of reviewing the restructuring transactions in which Dynegy Holdings was involved, and confirmed Susheel Kirpalani as the Bankruptcy Examiner on January 12, 2012. (Am. Compl. ¶ 60.) Kirpalani issued his

report on March 9, 2012, finding that Dynegy had, through its restructuring, intended to "delay and hinder" its creditors. (Am. Compl. ¶ 84.) Assuming insolvency—and noting that although the Examiner viewed the assumption as reasonable, "many of the conclusions reached [in the report] would be different if Dynegy Holdings were, in fact, solvent[,]" (Porritt Decl., Ex. A at 14)—Kirpalani stated that the CoalCo transfer was an actual and constructive fraudulent conveyance. (Am. Compl. ¶ 84.) However, the Examiner found that there was no intent to defraud or affirmatively deceive creditors under the Bankruptcy Code because Dynegy set out the actual facts of the relevant transactions in its public filings. (Porritt Decl., Ex. A at 123–24.)

Dynegy vigorously objected to the Examiner's Report, pointing out, among other things, that the effect of the undertaking was to require Dynegy to make principal and interest payments on debt of Dynegy Holdings that Dynegy Holdings would otherwise be required to make, and that the satisfaction of antecedent debt constitutes reasonably equivalent value based on the face amount of the debt. (Baumstein Decl., Ex. 7 at 49–50.) Kirpalani's conclusions were never litigated in the bankruptcy action because Dynegy Holdings reached a settlement with its creditors. (*See* Am. Compl. ¶ 86.) On the day that Kirpalani issued his report, shares of Dynegy's common stock fell 35%. (Am. Compl. ¶ 85.)

### E.

The plaintiffs have not sued Dynegy or Dynegy Holdings in this action. Instead, the plaintiffs have sued several individual defendants. Defendant Robert Flexon is the President and CEO of Dynegy and a Director of both Dynegy and Dynegy Holdings. (Am. Compl. ¶ 18.) Defendant Clint Freeland is an Executive Vice President and the Chief Financial Officer of Dynegy. (Am. Compl. ¶ 19.) Defendant Kevin Holwell is an Executive Vice President and the Chief Operating Officer of Dynegy. (Am. Compl. ¶ 20.) Defendants Thomas Elward, Michael Embler, Vincent Intrieri, and Samuel Merksamer were Directors of Dynegy at all times during the Class Period. (Am. Compl. ¶¶ 21, 23–25.) Defendant E. Hunter Harrison also served as a Director of Dynegy, but for only a portion of the Class Period. (Am. Compl. ¶ 22.) Finally, Defendant Carl Icahn is a minority shareholder of Dynegy who held 14.8% of Dynegy's common stock at all times during the Class Period. (Am. Compl. ¶ 17.)

### F.

The plaintiffs allege that defendants Flexon, Freeland, and Merksamer (together, the "10(b) Defendants"), violated Section 10(b) of the Exchange Act, and Rule 10b–5. According to the Amended Class Action Complaint, the 10(b) Defendants knew or were reckless in not knowing of the alleged misstatements regarding Dynegy's restructuring that are at issue in this action and that were made in press releases, presentations, and SEC filings. (Am. Compl. ¶¶ 108–110.)

The plaintiffs allege that statements describing Dynegy's refinancing and First Step Restructuring, made in July and early August of 2011, were materially misleading because they omitted information pertaining to the subsequent CoalCo transaction. (Am. Compl. ¶¶ 65, 76.) More particularly, the plaintiffs allege that the 10(b) Defendants breached a duty to disclose information regarding the CoalCo transfer in connection with the July 10, 2011 press release, July 13, 2011 conference call, and August 8, 2011 press release, conference call, investor presentation, and

Quarterly Report to the SEC. (Am. Compl. ¶¶ 65, 76.) Additionally, the plaintiffs allege that Merksamer materially misrepresented Dynegy's restructuring plans to the Delaware Court when, on July 25, 2011, he submitted an affidavit asserting that Dynegy Holdings would continue to possess after the First Step Restructuring those assets ultimately transferred to Dynegy in the CoalCo transaction. (Am. Compl. ¶¶ 67, 70.)

The plaintiffs also allege that statements made in a September 2, 2011 press release, a November 14, 2011 SEC filing, and a March 8, 2012 SEC filing, were materially misleading for three reasons: first, because each failed to disclose that Dynegy Holdings was insolvent or nearly insolvent, second, because each failed to disclose that the CoalCo transfer was intended to delay and hinder creditors of Dynegy Holdings, and third, because each failed to disclose that the value of the undertaking ultimately assigned to Dynegy Holdings in exchange for CoalCo was substantially less than $1.25 billion. (Am. Compl. ¶¶ 78, 80, 82.)

Finally, the plaintiffs allege that each of the defendants in this action violated Section 20(a) of the Exchange Act as a control person of Dynegy. (Am. Compl. ¶¶ 113–114.)

## III.

The defendants move to dismiss the asserted violations of Section 10(b) and Rule 10b–5 because the plaintiffs have failed to allege material misstatements or omissions and scienter.

■ Section 10(b), as effectuated by Rule 10b–5, makes it "unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) and Rule 10b–5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000); *see also City of Roseville*, 814 F.Supp.2d at 409.

In this action, the plaintiffs do not allege that the defendants misstated any facts pertaining to Dynegy's finances, nor do the plaintiffs allege that the defendants made any affirmative misrepresentations in describing the transactions involved in Dynegy's refinancing or restructuring. Rather, the plaintiffs allege that the 10(b) Defendants made several material omissions in connection with public statements concerning Dynegy's refinancing and restructuring.

■ An alleged omission of fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted). "Put another way, a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir.2010) (citation and internal quotation marks omitted).

■ "[A]n omission is actionable under [federal] securities laws only when the [defendant] is subject to a duty to disclose

the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (citations omitted). Even though Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 160 (S.D.N.Y. 2008). However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Optionable Sec. Litig.*, 577 F.Supp.2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d at 575, 2013 WL 5878814, at *6.

### A.

The 10(b) Defendants first argue that statements in which they accurately described Dynegy's refinancing and First Step Restructuring, and which they made in July and early August of 2011, were not materially misleading because of the alleged failure to disclose information pertaining to the subsequent CoalCo transfer. According to the 10(b) Defendants, the alleged omissions could not have misled a reasonable investor because Dynegy's public disclosures sufficiently conveyed that further restructuring was likely, and that it might involve transactions precisely like the CoalCo transfer.

The Second Circuit Court of Appeals has held that disclosures broad enough to cover a specific contingency are sufficient to satisfy any duty to disclose the specific contingency. *See Hunt v. Alliance N. Am.*

*Gov't Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir.1998) (disclosure that fund would invest in "[g]overnment guaranteed mortgage-related securities" sufficient to disclose investments in "collateralized mortgage obligations"); *see also Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 Fed.Appx. 33, 36 (2d Cir.2013) (summary order) (disclosures that identified fund exposure to "certain U.S. securitizations of residential mortgages" sufficient to disclose precise exposure to subprime mortgages); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d at 579, 2013 WL 5878814, at *10 (disclosure that bank routinely faced litigation, and that litigation risks were significant, increasing, and could materially affect corporate finances, sufficient to disclose particular threatened litigation).

In this case, Dynegy made significant public disclosures pertaining to its ongoing restructuring efforts. Although the plaintiffs argue that Dynegy's disclosures did not adequately inform investors that its initial refinancing and restructuring together constituted the first of two steps in a planned restructuring process, Dynegy in fact disclosed in July 2011, that its refinancing and restructuring were only "the initial step in the Company's operating and financial restructuring." (Am. Compl. ¶ 62.) And although the plaintiffs contend that the 10(b) Defendants failed to inform investors that subsequent restructuring might involve transferring assets from Dynegy Holdings to another entity, Dynegy informed investors as early as July 2011 that it would pursue "additional potential debt restructuring activities" which might include "direct or indirect transfers of equity interests of [Dynegy Holdings] . . . and/or further reorganizations of [Dynegy] and/or various of its subsidiaries." (Am. Compl. ¶ 63.)

Moreover, Dynegy publicly cautioned that subsequent restructuring transactions could provoke litigation. In public disclosures filed with the SEC on July 11, 2011, Dynegy stated that it might, after the refinancing was complete, "engage in transactions that increase the likelihood of [Dynegy's] estate or creditors challenging the [refinancing]." (Baumstein Decl., Ex. 2, Exec. Summ. at 6.) On August 8, 2011, when Dynegy disclosed the First Step Restructuring in its Quarterly Report to the SEC, Dynegy again cautioned investors that it was pursuing further restructuring, and that further restructuring might affect assets and entities held by Dynegy Holdings. Indeed, the Quarterly Report reiterated that:

> [T]he August 2011 reorganization represents [Dynegy's] first step in addressing [Dynegy's] liquidity concerns. Over the next eighteen months ... [Dynegy] may participate in additional debt restructuring activities, which may include direct or indirect transfers of [Dynegy] subsidiaries' equity interests ... and/or further reorganizations of our subsidiaries as well as other similar initiatives."

(Am. Compl. ¶ 72.)

Dynegy's disclosures plainly conveyed to any reasonable investor that Dynegy was in July and August of 2011 contemplating further restructuring that might involve removing assets then under the control of Dynegy Holdings. Dynegy made clear that its restructuring might involve transferring assets from Dynegy Holdings to other entities and even warned that its restructuring efforts could provoke challenges from creditors. Because no reasonable investor could read Dynegy's disclosures without understanding that the Company was contemplating transactions like the CoalCo transfer, the 10(b) Defendants had no duty to disclose more. *See*

*Freeman*, 540 Fed.Appx. at 36; *Hunt*, 159 F.3d at 731.

The plaintiffs contend that Dynegy's disclosures were insufficient to satisfy the 10(b) Defendants' duty to speak accurately and completely because, while the disclosures described the possibility of transactions like the CoalCo transfer, Dynegy had already decided to execute the CoalCo transfer when the disclosures were made. While "half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud," *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir.2011) (citations and internal quotation marks omitted), the plaintiffs have not plausibly alleged that the 10(b) Defendants uttered any half-truths because the plaintiffs have not alleged that Dynegy had resolved to execute the CoalCo transfer when the relevant statements were made.

The Amended Class Action Complaint alleges that the FRC devised, by May 15, 2011, "a multi-step plan to reorganize Dynegy's business segments and reorganize and restructure its debts." (Am. Compl. ¶ 43.) According to the Amended Class Action Complaint, this plan involved shifting assets from Dynegy Holdings to Dynegy, because the latter was free of debt and could thus shield assets from creditors. (Am. Compl. ¶ 43.)

The plaintiffs allege that Dynegy's Board of Directors began considering the FRC's restructuring plan at a meeting on May 18, 2011, and continued discussing the plan at subsequent meetings on June 15, 2011, June 28, 2011, and August 4, 2011. These allegations, however, do not plausibly allege that Dynegy's Board of Directors adopted the second step of the FRC's restructuring plan in advance of the disclosures upon which the 10(b) Defendants rely. The relevant disclosures were made between July 10, 2011 and August 8,

2011, and the Amended Class Action Complaint contains no allegation that the Dynegy Board had actually adopted the second step of the FRC restructuring plan before August 8, 2011. While the possibility of further restructuring was plainly disclosed, until the Board actually adopted the second step of the restructuring, contingencies could plainly have prevented the subsequent transfer. The plaintiffs allege only that the CoalCo transfer was still being considered on August 4, 2011, (Am. Compl. ¶ 43), and was executed on September 1, 2011, the same day that the Dynegy Board of Directors approved the transaction, (*see* Baumstein Decl., Ex. 6 at 8.) The transfer was promptly announced on September 2, 2011. (Am. Compl. ¶ 77.) Accordingly, the plaintiffs have not plausibly alleged that disclosures pertaining to Dynegy's restructuring were rendered false or misleading by the Company's deliberations with respect to the CoalCo transfer. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996).

In light of Dynegy's robust disclosure, the public statements with respect to Dynegy's refinancing and First Step Restructuring could not have misled a reasonable investor. Moreover, the 10(b) Defendants had no obligation to disclose the particulars of the CoalCo transfer, which was merely under consideration and in any event consistent with Dynegy's stated business goals. Similarly, the plaintiffs have failed to allege that Defendant Merksamer made a material omission when he represented to the Delaware Court that Dynegy Holdings would continue after the First Step Restructuring to possess those assets ultimately transferred to Dynegy in the CoalCo transfer.[1] (Am. Compl. ¶¶ 67, 70; *see also* Porritt Decl., Ex. A at 2 (finding that Dynegy Holdings continued to own assets after First Step Restructuring).) As a result, the plaintiffs have not alleged actionable omissions with respect to any statements regarding Dynegy's refinancing and First Step Restructuring.

### B.

The 10(b) Defendants next argue that statements made in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 filings with the SEC, could not have contained material omissions because of a failure to disclose that Dynegy Holdings was insolvent or nearly insolvent when Dynegy executed the CoalCo transfer. (Am. Compl. ¶¶ 78, 80, 82.) The 10(b) Defendants contend that the failure to apply the term "insolvent" to Dynegy Holdings in otherwise accurate disclosures regarding the CoalCo transfer cannot support a Section 10(b) violation because the term insolvent is a characterization, not a material fact.[2]

■ Federal securities laws are designed to promote the disclosure of facts.

---

1. Merksamer also argues that his representations are not actionable because they were not made "in connection with" the purchase or sale of securities. Because Merksamer had no duty to disclose that Dynegy was considering the CoalCo transfer, it is unnecessary to decide whether Merksamer's statements to the Delaware Court were made in connection with the purchase or sale of a security under Section 10(b).

2. The Amended Complaint never explains whether it is referring to insolvency as defined in the bankruptcy statute, namely, where the fair market value of liabilities exceeds the fair market value of assets, *see* 11 U.S.C. § 101(32)(A), or, alternatively, whether references to insolvency refer to the common law test of insolvency: "whether there is a general inability on the part of the debtor to pay its obligations as they become due in the regular course of business," *Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.)*, 136 B.R. 636, 639 (Bankr.S.D.N.Y.1992).

*See, e.g., Kowal v. MCI Commc'ns Corp.,* No. 90 Civ. 2862, 1992 WL 121378, at *4 (D.D.C. May 20, 1992), *aff'd,* 16 F.3d 1271 (D.C.Cir.1994). The importance of disclosed facts, and any "characterizations of or conclusions drawn from those facts[,] are matters that are left to the judgment of investors." *Id.; see also Portannese v. Donna Karan Int'l, Inc.,* No. 97–CV–2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998); *Goldberger v. Baker,* 442 F.Supp. 659, 665 (S.D.N.Y.1977).

■ The plaintiffs argue that Dynegy had a duty to disclose that Dynegy Holdings was insolvent when issuing public statements with respect to the CoalCo transfer. However, the plaintiffs do not argue that Dynegy Holdings misstated or withheld any factual information regarding the financial condition of Dynegy Holdings. Indeed, the plaintiffs explicitly pleaded that Dynegy made disclosures regarding the financial difficulties affecting Dynegy Holdings, as, for example, by disclosing in its 2010 Annual Report that Dynegy Holdings had suffered a net loss of $242 million in fiscal year 2010. Dynegy also provided a consolidated balance sheet with its SEC Form 8–K dated September 8, 2011, and the plaintiffs have not explained what information in this statement was inaccurate.

Because Dynegy supplied investors with financial information from which investors could draw their own conclusions about whether Dynegy Holdings was solvent, the 10(b) Defendants had no duty to use the term "insolvent" when describing the financial condition of Dynegy Holdings at the time the CoalCo transfer occurred. *See Portannese,* 1998 WL 637547, at *13 ("[C]ompany has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." (citation omitted)); *Kowal,* 1992 WL 121378, at *5 (company has no duty to characterize transaction where there is no allegation that defendants "concealed or misrepresented any data relating to the financial details" of the relevant transaction); *Goldberger,* 442 F.Supp. at 664 (company has no duty to disclose that terms of loans were unfair or inconsistent with company policy where complaint "does not allege that the terms of the loans were not disclosed or disclosed in a misleading manner").[3]

### C.

■ The 10(b) Defendants also argue, correctly, that the statements made in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 filings with the SEC, were not materially misleading based on a failure to disclose that the CoalCo transaction was motivated by a desire to delay and hinder creditors of Dynegy Holdings. (Am. Compl. ¶¶ 78, 80, 82.) The 10(b) Defendants had no obligation to accuse themselves of wrongdoing. *See, e.g., Richman v. Goldman Sachs Grp., Inc.,* 868 F.Supp.2d 261, 273 (S.D.N.Y. 2012) ("The federal securities laws do not require a company to accuse itself of wrongdoing." (citation and internal quotation marks omitted)); *In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367, 377 (S.D.N.Y.2004) (same), *aff'd on other grounds sub nom. Albert Fadem Trust v. Citigroup, Inc.,* 165 Fed.Appx. 928 (2d Cir.

---

**3.** The defendants also argue that the plaintiffs have not plausibly alleged that Dynegy Holdings was in fact insolvent when the CoalCo transfer occurred. Because the defendants had no duty to use the term "insolvent" in describing the finances of Dynegy Holdings, it is unnecessary to decide whether the Amended Class Action Complaint adequately pleads that Dynegy Holdings was insolvent when the alleged omissions occurred.

2006) (summary order); *Ciresi v. Citicorp.*, 782 F.Supp. 819, 823 (S.D.N.Y.1991) (same) (collecting cases), *aff'd*, 956 F.2d 1161 (2d Cir.1992).

In any event, the plaintiffs have not responded to the 10(b) Defendants' argument that the failure to disclose their alleged intent to delay and hinder creditors is not actionable under Section 10(b). Accordingly, these claims are deemed abandoned. *See, e.g., In re Dana Corp.*, 412 B.R. 53, 64 (S.D.N.Y.2008); *Katz v. Image Innovations Holdings, Inc.*, 542 F.Supp.2d 269, 275 (S.D.N.Y.2008).

### D.

Finally, the plaintiffs allege that the 10(b) Defendants failed to disclose in the September 2, 2011 press release, and the November 14, 2011 and March 8, 2012 filings with the SEC, that the "value of the 'undertaking' was substantially less than $1.25 billion." (Am. Compl. ¶¶ 78, 80, 82.) The 10(b) Defendants argue that there was no material omission.

 The representations made with respect to the value of the undertaking in the September, November, and March statements are substantially identical. In each statement, Dynegy represented that it had concluded that the fair value of its acquired equity stake in CoalCo was approximately $1.25 billion, and that Dynegy had provided "this value" to Dynegy Investments in exchange for the CoalCo assets through the issuance of the undertaking. (*See* Am. Compl. ¶ 77; *see also* Am. Compl. ¶¶ 79, 81.) In each of the statements, Dynegy also disclosed that the undertaking required that Dynegy "make proportionate payments at the times that Dynegy Holdings is obligated to make payments of principal and interest" under $1.1 billion of notes due in 2019, and $175 million of notes due in 2026. (*See* Am. Compl. ¶ 77; *see also* Am. Compl. ¶¶ 79, 81.) It is undisputed that, in addition to disclosing what the undertaking required in the statements to which the plaintiffs object, Dynegy disclosed all material facts and documents regarding the CoalCo transfer and, more specifically, the undertaking.

Despite these substantial disclosures, the plaintiffs claim that the failure to disclose that the undertaking was worth substantially less than $1.25 billion was materially misleading because the 10(b) Defendants made representations about the value of the undertaking without performing a valuation. With respect to the September 2, 2011 and November 14, 2011 statements, this argument presents a close question.

The plaintiffs do not contend that Dynegy withheld or misstated any material facts regarding the undertaking, or that Dynegy performed and withheld the results of a valuation. Moreover, the plaintiffs cite no authority for the proposition that the 10(b) Defendants had an independent duty to perform a valuation. The 10(b) Defendants argue that, in light of these facts, Dynegy was not required to perform a valuation of the undertaking. According to the 10(b) Defendants, the absence of a duty to value the undertaking is dispositive because they cannot be liable for failing to disclose information they had no obligation to generate and did not otherwise possess.

The plaintiffs reply that once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola*, 295 F.3d at 331. The plaintiffs argue that, although the 10(b) Defendants had no obligation to characterize the value that Dnyegy provided to Dynegy Investments through the undertaking, the decision to do so gave rise to a duty to be accurate. According to the plaintiffs, this duty required that a valuation be performed, and its results be

disclosed. The plaintiffs contend that the 10(b) Defendants cannot have satisfied this duty because they did not perform a valuation.

The plaintiffs' position relies to some extent on a strained reading of the September 2, 2011 and November 14, 2011 disclosures. The disclosures explained that the approximate "fair value" of the CoalCo equity stake was approximately $1.25 billion. While the disclosures said that "this value" was provided through the undertaking, the disclosures did not state that the "value" of the undertaking was $1.25 billion. And, indeed, any reasonable investor could have looked at the facts of the undertaking as disclosed and concluded that the "value" of an undertaking to pay amounts equal to the principal and interest of debt in the amount of $1.25 billion that came due at various times over approximately fourteen years was worth less than the face amounts of those payments. Indeed, the Examiner faulted Dynegy because the Examiner concluded that the "present value" of the payments to Dynegy Holdings was worth only approximately $860 million. (Porritt Decl., Ex. A at 7.)

It is unnecessary to decide whether the description of the undertaking in the September 2, 2011 and November 14, 2011 disclosures was misleading because of the failure to include a present value calculation, despite the accurate factual description of the undertaking, because, as explained below, it is plain that the plaintiffs have failed to allege scienter with respect to the disclosures, as well as with respect to the other alleged omissions.

It is clear, however, that the plaintiffs have made no plausible claim of an actionable omission in the March 8, 2012 SEC filing with respect to the value of undertaking. This is so because the plaintiffs acknowledge that Dynegy in fact disclosed in its March 8, 2012 filing that it had valued the undertaking at only $728 million. (*See* Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 19; *see also* Porritt Decl., Ex. D at F–46.) Accordingly, the plaintiffs have failed to allege a plausible claim that the March 8, 2012 SEC filing was materially misleading because of a failure to disclose that the undertaking was worth substantially less than $1.25 billion.

## IV.

The defendants argue that the plaintiffs' Section 10(b) and Rule 10b–5 claim should also be dismissed because the plaintiffs have not alleged facts supporting a strong inference of scienter. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996) (internal citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI,* 493 F.3d at 99; *see also City of Roseville,* 814 F.Supp.2d at 418–19 (same).

In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. *See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Arbitron Inc.,* 741 F.Supp.2d 474, 488 (S.D.N.Y.2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible

opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324, 127 S.Ct. 2499; *see also Slayton v. Am. Express Co.,* 604 F.3d 758, 766 (2d Cir.2010); *In re Bank of Am. AIG Disclosure Sec. Litig.,* 980 F.Supp.2d at 585–86, 2013 WL 5878814, at *16.

In this case, the plaintiffs allege scienter on both "motive and opportunity" and "conscious misbehavior or recklessness" theories. These theories are considered in turn.

### A.

With respect to motive and opportunity, the plaintiffs argue only that Dynegy had a motive to make material misrepresentations in describing its refinancing and First Step Restructuring. The plaintiffs contend that Dynegy had a motive to conceal the Company's plans to transfer assets from Dynegy Holdings to Dynegy because the Company would not otherwise have been able to induce creditors to restructure various loans. The plaintiffs offer no argument that any other party or non-party to this action had motive and opportunity to make the omissions alleged in the Amended Class Action Complaint.

██ The plaintiffs' argument that Dynegy was motivated to mislead its creditors does not support any inference that the defendants accused of primary violations—namely, Flexon, Freeland, and Merksamer—had the motive and opportunity to defraud Dynegy's shareholders. The plaintiffs may not impute the motivations of Dynegy, a non-party corporate entity, to the individual defendants. Rather, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. *See Arbitron Inc.,* 741 F.Supp.2d at 488.

In any event, it is well-settled that plaintiffs seeking to allege scienter based on a defendant's motive and opportunity to commit fraud "must assert a concrete and personal benefit to the individual defendant[ ] resulting from the fraud." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001). In this case, the plaintiffs have not alleged any concrete and personal benefit to any defendant. The plaintiffs do not allege any sales of stock during the Class Period, nor do they identify any other specific means through which Flexon, Freeland, or Merksamer might have gained by the alleged fraud. Indeed, the motive that the plaintiffs seek to impute to the individual defendants—a desire to capture value for Dynegy and its shareholders by negotiating more favorable credit arrangements and by restructuring assets—is a generic one insufficient to allege a defendant's motive and opportunity. *See, e.g., Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir. 1996) ("The motive to maintain the appearance of corporate profitability ... will naturally involve benefit to a corporation, but does not entail concrete benefits." (citations and internal quotation marks omitted)); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 196–97 (2d Cir. 2008) (desire to avoid disclosing impaired quality of collateral on various loans constitutes motive to maintain appearance of profitability and does not entail concrete and personal benefits); *In re PXRE Grp., Ltd., Sec. Litig.,* 600 F.Supp.2d 510, 532 (S.D.N.Y.2009) (desire to maintain credit rating to raise money necessary for company's survival does not entail concrete and personal benefits), *aff'd sub nom. Condra v. PXRE Grp. Ltd.,* 357 Fed.Appx. 393 (2d Cir.2009) (summary order); *In re*

*DRDGOLD Ltd. Sec. Litig.,* 472 F.Supp.2d 562, 570 (S.D.N.Y.2007) (desire to raise capital does not entail concrete and personal benefits).

The plaintiffs have not pleaded facts suggesting that, as a result of the alleged fraud, Flexon, Freeland, or Merksamer stood to obtain any specific benefits that are not "either generalized to all [defendants] or beneficial to all shareholders." *Kalnit,* 264 F.3d at 142. Accordingly, the plaintiffs have not alleged that Flexon, Freeland, or Merksamer had any legally sufficient motive to make the asserted misrepresentations.

### B.

■ Where, as here, a defendant's motive to commit fraud is not apparent, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." *Kalnit,* 264 F.3d at 142. Plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000). As the Second Circuit Court of Appeals has explained, "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill,* 101 F.3d at 269 (alterations in original). Because the plaintiffs allege fraudulent omissions, rather than false statements, "it is especially important to rigorously apply the standard for pleading intent." *In re GeoPharma, Inc. Sec. Litig.,* 411 F.Supp.2d 434, 437 (S.D.N.Y.2006); *see also In re Bank of Am. AIG Disclosure Sec. Litig.,* 980 F.Supp.2d at 585–86, 2013 WL 5878814, at *16. The plaintiffs do not allege a strong inference of scienter based on Flexon's, Freeland's, or Merksamer's alleged conscious or reckless misbehavior.

### 1.

The plaintiffs argue that they have alleged that Flexon, Freeland, and Merksamer acted with fraudulent intent when, in statements made during July and August of 2011, they failed to disclose the CoalCo transfer.

■ With respect to the July and August statements, the plaintiffs contend that Defendants Flexon, Freeland, and Merksamer acted with fraudulent intent when making the relevant statements because each had already acquired knowledge that Dynegy intended to execute the CoalCo transfer. However, there are no particularized allegations that the 10(b) Defendants were confronted with facts contradicting their public representations in July and August of 2011 because there is no indication that the Dynegy Board of Directors approved the CoalCo transfer until September 1, 2011. Therefore, the plaintiffs have not sufficiently alleged that the 10(b) Defendants acted with conscious or reckless disregard for a known or obvious duty when they failed to disclose the potential CoalCo transfer. *Cf. Chill,* 101 F.3d at 269–70.

### 2.

■ The plaintiffs argue that they have pleaded facts sufficient to support a strong inference that the 10(b) Defendants acted with fraudulent intent by failing to disclose in Dynegy's September 2, 2011 press release and November 14, 2011 and March 8, 2012 SEC filings that Dynegy Holdings was allegedly insolvent. But the Amended Class Action Complaint fails to particularize any allegations against De-

fendants Freeland and Merksamer. Indeed, the Amended Class Action Complaint alleges that the FRC, the Dynegy Board, and Dynegy's professional advisors did not undertake any solvency analysis at the time that the restructuring took place.

■ With respect to Defendant Flexon, the plaintiffs assert conclusorily that "Flexon believed that Dynegy Holdings was insolvent when he joined [Dynegy] in June 2011." (Am. Compl. ¶ 91.) But the plaintiffs have pleaded no facts in support of this conclusory allegation, which is insufficient to support the required strong inference of scienter. *See* 15 U.S.C. § 78u–4(b)(2) (requiring that plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"). Accordingly, the plaintiffs have failed to allege with sufficient particularity that Flexon acted with conscious or reckless disregard for a known or obvious duty when he failed to characterize Dynegy Holdings as insolvent in each relevant statement. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994) (allegations that defendants knew reserves were inadequate and intentionally concealed vulnerability of assets were "so broad and conclusory as to be meaningless" and thus insufficiently particular to support scienter (citation omitted)); *Anwar v. Fairfield Greenwich Ltd.*, 891 F.Supp.2d 548, 554–55 (S.D.N.Y. 2012) (allegations insufficiently particular to support scienter); *see also Feiner Family Trust v. Xcelera.com, Inc.*, No. 07 Civ. 1914, 2008 WL 5233605, at *5 (S.D.N.Y. Dec. 15, 2008), *aff'd sub nom. Feiner Family Trust v. VBI Corp.*, 352 Fed.Appx. 461 (2d Cir.2009) (summary order) (same).[4]

3.

Finally, the plaintiffs argue that they have alleged a strong inference that the 10(b) Defendants acted with scienter when they failed to disclose in the September 2, 2011 press release, and November 14, 2011 and March 8, 2012 SEC filings that the undertaking was worth substantially less than $1.25 billion. However, plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Moreover, the defendants must have knowledge of or access to contradictory facts at the time that the alleged misstatements are made. *See, e.g., In re PXRE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d at 536; *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 484 (S.D.N.Y.2006).

■ In this case, the plaintiffs allege that the 10(b) Defendants knew that the undertaking did not have a "fair value" of $1.25 billion. (Am. Compl. ¶ 90.) However, the plaintiffs acknowledge that Dynegy did not conduct a valuation of the undertaking until it began preparing its March 2012 financial statements. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 19.) The plaintiffs have not sufficiently alleged that the 10(b) Defendants knowingly failed to disclose a valuation, given that the plaintiffs concede a valuation was prepared only after the public disclosures about which they complain. *See, e.g., In re PXRE Grp., Ltd., Sec. Litig.*, 600 F.Supp.2d at 536; *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d at 484.[5]

---

**4.** Similarly, the plaintiffs have failed to allege specific facts to support their abandoned claim that the 10(b) Defendants knew that the CoalCo transfer was motivated by a desire to delay and hinder creditors of Dynegy Holdings.

**5.** The plaintiffs also allege that the defendants "actively avoided" valuing the undertaking.

The plaintiffs' allegations are also insufficient to allege a strong inference of scienter with respect to statements made in Dynegy's March 8, 2012 Annual Report to the SEC. In that Report, Dynegy disclosed that the undertaking was worth only $728 million. (Porritt Decl., Ex. D at F–46.) Because Dynegy disclosed in its Annual Report the very information that the plaintiffs claim was omitted from it, the plaintiffs cannot allege that the 10(b) Defendants made an actionable omission in the Annual Report, let alone that the defendants did so with the required intent to defraud.

4.

■ The plaintiffs have also failed to allege scienter because they have failed to allege that the 10(b) Defendants intended through their alleged omissions to defraud Dynegy's shareholders. The Second Circuit Court of Appeals has required that, to allege a Section 10(b) claim, plaintiffs plead facts "support[ing] an inference of an intent to defraud the plaintiffs rather than some other group." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.2009) (citation omitted). In *ECA*, the plaintiffs alleged that JP Morgan had concealed transactions with Enron in exchange for excessive fees from Enron. 553 F.3d at 203. The Court of Appeals held that the plaintiffs had failed to allege that JP Morgan acted with the intent to defraud its shareholders because the purported scheme allowed JP Morgan to extract substantial fees from Enron and therefore benefited JP Morgan's shareholders at the expense of Enron's investors. *Id.; see also Kalnit*, 264 F.3d at 141

(intent in merger negotiations to defraud acquiring company did not sufficiently allege intent to defraud shareholders who benefited from more favorable acquisition terms).

The plaintiffs in this case allege schemes that were intended to benefit Dynegy's shareholders at the expense of the creditors of Dynegy and Dynegy Holdings. For example, the plaintiffs claim that the failure to disclose that Dynegy was contemplating the CoalCo transfer in July and August statements allowed Dynegy to negotiate more favorable credit arrangements. However, the plaintiffs do not explain how the alleged intent to improve Dynegy's position vis-à-vis its creditors could defraud Dynegy's shareholders. Indeed, it appears that Dynegy's successful refinancing would have been beneficial to its shareholders. (*See* Am. Compl. ¶ 72.) Because the plaintiffs have not alleged facts supporting a plausible inference that the July and August omissions in any way defrauded Dynegy's shareholders, the plaintiffs have not alleged a strong inference of scienter with respect to those alleged omissions. *See ECA*, 553 F.3d at 198.

Under *ECA* and *Kalnit*, the pleaded facts with respect to the 10(b) Defendants' failure to disclose that Dynegy Holdings was allegedly insolvent, and that the undertaking was worth substantially less than $1.25 billion dollars, also fail to allege plausibly that the defendants intended to defraud Dynegy's shareholders, and thus fail to allege a strong inference of scienter. According to the plaintiffs, the 10(b) Defendants' failure to disclose that Dynegy Holdings was allegedly insolvent and that

(Am. Compl. ¶¶ 8, 90.) However, there are no particularized allegations that the defendants and their professional advisors were aware of facts that required them to conduct a present value calculation of the undertaking, as opposed to setting out the facts of the

undertaking. Moreover, the plaintiffs' allegation goes to an alleged effort to deceive the creditors of Dynegy Holdings, rather than the plaintiffs and other Dynegy shareholders, which, as explained below, would be insufficient for purposes of alleging scienter.

the undertaking was worth substantially less than $1.25 billion dollars was intended to enable Dynegy to execute the CoalCo transfer and, in turn, to extract concessions from creditors of Dynegy Holdings. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss at 20). Indeed, the plaintiffs allege, and the Bankruptcy Examiner found, that the CoalCo transfer was intended to allow Dynegy to capture for its shareholders "any value attainable by acquiring Dynegy Holdings's bonds at a discount." (Porritt Decl., Ex. A at 4.)

This allegation is consistent with the Examiner's broader findings. The Examiner found that throughout Dynegy's refinancing, First Step Restructuring, and execution of the CoalCo transfer, "the Dynegy Inc. board favored paths that benefited Dynegy Inc. and its stockholders to the detriment of Dynegy Holdings and its creditors." (Porritt Decl., Ex. A at 5.) However, Dynegy's apparent desire to capture value for its shareholders, at the expense of the creditors of Dynegy Holdings, does not constitute intent to defraud Dynegy shareholders such as the plaintiff, nor does such a desire constitute extreme disregard for a known or obvious duty owed to Dynegy's shareholders. *See ECA,* 553 F.3d at 198; *Kalnit,* 264 F.3d at 141.

5.

The plaintiffs' allegation of scienter is also insufficient because the plaintiffs have failed to allege an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499.

Dynegy made robust disclosures concerning its refinancing and First Step Restructuring and concerning the CoalCo transfer. For example, when Dynegy announced its refinancing and First Step Restructuring on July 10, 2011, it cautioned that the FRC and Board of Directors would "continue to work with its advisors in connection with additional potential debt restructuring activities, which may include direct or indirect transfers of equity interests of [Dynegy Holdings] ... and/or further reorganizations of [Dynegy] and/or various of its subsidiaries." (Am. Compl. ¶ 63.) Dynegy made substantially similar representations in its August 2011 Quarterly Report to the SEC. (Am. Compl. ¶ 72.)

Dynegy also warned its shareholders that its attempt to restructure assets would increase its exposure to litigation. In public disclosures filed with the SEC on July 11, 2011, Dynegy disclosed that it might, after the refinancing was complete, "engage in transactions that increase the likelihood of [Dynegy's] estate or creditors challenging the [refinancing]." (Baumstein Decl., Ex. 2, Exec. Summ. at 6.) Following the CoalCo transfer, Dynegy made additional disclosures regarding its vulnerability to potential claims, alerting investors to the possibility that its creditors might seek to assert "a variety of claims against Dynegy ... challenging some or all of the transactions ... under state or federal law for, among other things, breach of contract, [and] fraudulent transfer or preference." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.) Indeed, Dynegy even described the potential remedies that might be awarded to litigants who prevailed on claims that the CoalCo transaction was unlawful, including disgorgement and the transfer of CoalCo back to Dynegy Investments. (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.) Dynegy cautioned that "no assurance [could] be provided that any such litigation would be resolved in [its] favor." (Baumstein Decl., Ex. 5, Exhibit 99.2 at 3.)

These disclosures plainly alerted investors to the risks involved in Dynegy's re-

structuring efforts and, accordingly, weigh heavily against scienter. *See, e.g., In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d at 586–87, 2013 WL 5878814, at \*17; *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at \*15 (S.D.N.Y. Sept. 28, 2012). The disclosures in this case support a compelling inference that the omissions alleged in the Amended Class Action Complaint resulted from the belief of the 10(b) Defendants that Dynegy's public disclosures satisfied any duty owed to the Company's shareholders. That inference is far more compelling than any offered by the plaintiffs. Indeed, the inference that any alleged omissions occurred because Flexon, Freeland, and Merksamer reasonably believed that further disclosures were unnecessary is underscored by the Examiner's Report. The Examiner explicitly found that there was "no evidence of an intent to defraud or affirmatively deceive creditor[s] because ... Dynegy disclosed to the investing public the August Refinancing and the Ring-Fencing transactions on July 10, 2011 and disclosed the CoalCo transfer on September 1, 2011." (Porritt Decl., Ex. A at 124.)

Similarly, there is no plausible inference of scienter from the failure to disclose a present value of the undertaking when the terms of the undertaking were set out and when any reasonable investor could have determined whether a "present value" finding was necessary. The more plausible inference is that Dynegy and its advisers concluded that such a valuation was not necessary.

**6.** Although the defendants also allege that the plaintiffs have failed to allege loss causation, it is unnecessary to reach that argument.

**7.** The plaintiffs not only fail to allege that the 10(b) Defendants committed a primary violation, but also fail to allege that Dynegy committed a primary violation. This is so because the plaintiffs have generally failed to

Because the plaintiffs have failed to allege a strong inference of scienter, the plaintiffs' Section 10(b) and Rule 10b–5 claims must be dismissed. *See Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499.[6]

## V.

■ The plaintiffs also allege that the individual defendants are liable under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI*, 493 F.3d at 108 (citation omitted). In this case, the plaintiffs have not alleged a primary violation of Section 10(b) and Rule 10b–5.[7] Accordingly, the plaintiffs have not satisfied the first element of a Section 20(a) claim, and that claim must also be dismissed.

plead any actionable omission. Moreover, the plaintiffs have not pleaded facts sufficient to support a strong inference of scienter with respect to the individual defendants, and have not pleaded any facts supporting an inference of scienter with respect to a non-defendant whose intent can be imputed to Dynegy. *See Dynex Capital*, 531 F.3d at 195.

■ Moreover, the claim against Defendant Icahn must be dismissed for the additional reason that the plaintiffs have failed to plead facts supporting a plausible inference that Icahn controlled the defendants who allegedly committed the primary violations at issue in this case. The plaintiffs argue that Icahn exercised the control required under Section 20(a) primarily through his status as Dynegy's largest shareholder and through his control of two Dynegy Directors, whom Icahn employed at a separate enterprise.[8] Viewing holistically the indicia of control alleged, *see In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F.Supp.2d 244, 262 (S.D.N.Y.2005), the plaintiffs' argument is without merit.

The Amended Class Action Complaint alleges that Icahn possessed control for purposes of Section 20(a) because he employed the two individuals that he nominated to Dynegy's Board of Directors: Intrieri and Merksamer. This allegation lends no support to the plaintiffs' allegation that Icahn exercised control over primary violators because Intrieri and Merksamer were not working within the scope of their employment for Icahn when acting in their capacity as Directors of Dynegy. *See Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1357–58 (S.D.N.Y.1983); *see also In re Global Crossing Sec. Litig., Ltd.*, No. 02 Civ. 910, 2005 WL 1907005, at *30 (S.D.N.Y. Aug. 8, 2005) ("Although it may be true in some general sense that it is axiomatic that employers 'control' their employees . . ., pleading an employment relationship is insufficient to establish agency between [the employer defendant]

and its employees in their capacities as directors of an independent corporation." (internal citation and quotation marks omitted)).

The Amended Class Action Complaint also alleges that Defendant Icahn held 14.8% of Dynegy's common stock. However, a defendant's minority stock ownership is, in isolation, insufficient to allege control under Section 20(a). *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 489, 492 (S.D.N.Y.2005) ("Minority stock ownership is not enough to establish control person liability, since minority stock ownership does not give the owner the power to direct the primary violator." (citations omitted)); *In re Global Crossing Sec. Litig., Ltd.*, 2005 WL 1907005, at *1, *13 (15.8% minority ownership insufficient to establish control of primary violator under Section 20(a)); *In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (22% minority ownership insufficient to establish control of primary violator under Section 20(a)).

Therefore, the plaintiffs' Section 20(a) claim against Icahn must be dismissed for the additional reason that the plaintiffs have failed to allege sufficient facts to support a plausible claim that Icahn exercised the required control over a primary violator.

## VI.

In a footnote, the plaintiffs have requested leave to file a Second Amended Class Action Complaint in the event that the Court grants the defendants' motion to

---

**8.** The plaintiffs also allege that Icahn exercised control through knowledge obtained when a company under his control entered into merger agreement with Dynegy, and through the merger agreement itself. However, the plaintiffs acknowledge that the merger agreement between Icahn's company and Dy-

negy collapsed. Moreover, the plaintiffs fail to explain how mere knowledge of Dynegy afforded Icahn meaningful control. Accordingly, these allegations do not indicate that Icahn exercised any meaningful control over any primary violators.

dismiss the plaintiffs' Amended Class Action Complaint. In support of their request, the plaintiffs argue only that "the usual practice is to grant leave to amend the complaint." *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990) (citations omitted).

Federal Rule of Civil Procedure 15(a) provides that leave to file an amended complaint should be granted "freely ... when justice so requires." Fed.R.Civ.P. 15(a)(2); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, the "futility of amendment" is often cited as a valid basis for denying leave to amend. *See Foman,* 371 U.S. at 182, 83 S.Ct. 227; *Williams v. Citigroup Inc.,* 659 F.3d 208, 214 (2d Cir. 2011); *see also Twersky v. Yeshiva Univ.,* 993 F.Supp.2d 429, 451, No. 13 Civ. 4679, 2014 WL 314728, at *17 (S.D.N.Y. Jan. 29, 2014).

In this case, the Court offered the plaintiffs an opportunity to replead after the defendants filed their motion to dismiss, but the plaintiffs declined. Now, the plaintiffs ask for leave to replead without proffering any facts that might address the deficiencies in their Amended Class Action Complaint. Absent any such proffer, repleading in this action would be futile. *See Goodrich v. Long Island R.R. Co.,* 654 F.3d 190, 200 (2d Cir.2011) ("[W]ithout any showing that the deficiencies in the complaint could be cured, we must conclude that repleading would be futile."). Accordingly, the plaintiffs' request for leave to replead is denied.

### Conclusion

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted** and the plaintiffs' Amended Class Action Complaint is dismissed. The Clerk is directed to **enter judgment dismissing this action and closing the case. The Clerk is also directed to close all pending motions.**

**SO ORDERED.**