[941 NYS2d 157]

RICHARD FEINER AND COMPANY INC., Respondent, v PARAMOUNT PICTURES CORPORATION, Appellant.

First Department, April 5, 2012

**APPEARANCES OF COUNSEL**

*Davis Wright Tremaine LLP*, New York City (*Edward J. Davis, Marcia B. Paul* and *Elisa L. Miller* of counsel), for appellant.

*Gregory A. Sioris*, New York City, for respondent.

**OPINION OF THE COURT**

RENWICK, J.

In this action we are asked to interpret a 1986 contract under which defendant's predecessor in interest purchased the rights to exploit 17 feature-length motion pictures produced in the 1940s and 1950s by Warner Brothers. On the one hand, defendant Paramount Pictures Corporation asks us to interpret the contract broadly as to permit defendant to exploit the 17 pictures through national cable deals. On the other hand, plaintiff Richard Feiner and Company Inc. asks us to interpret the contract narrowly to reserve to plaintiff, as the grantor, the exclusive right to exploit the 17 pictures in certain important local markets such as New York City. Applying cardinal principles governing the construction of contracts, namely that a written contract will be read as a whole and every part will be interpreted with respect to the whole, we reject plaintiff's interpretation of the contract and dismiss the complaint.

Plaintiff trades in the motion picture and television industries, including the production and licensing of movies. On September 17, 1986, plaintiff and Republic Pictures Corp. entered into an agreement for the sale of plaintiff's "rights, and interest of every kind, nature, and description throughout the Universe" in 17 pictures, including all copyrights, renewals and extensions of copyrights (the agreement) for $2,475,000. The 17 pictures are: Blood on the Sun, Bugles in the Afternoon, Johnny Come Lately, Kiss Tomorrow Goodbye, Mission in Morocco, Only the Valiant, Blowing Wild, Cloak and Dagger, Court Martial of Billy Mitchell, Distant Drums, The Enforcer, Marjorie Morningstar, My Girl Tisa, Pursued, Retreat, Hell!, South of St. Louis, and Three Secrets.

Defendant's rights in perpetuity with regard to the 17 pictures are listed in paragraph 1 (a) of the agreement, which provides as follows:

> "Subject to paragraphs 2 and 5 below, Seller [Feiner] hereby sells, grants, assigns and sets over to Purchaser [now Paramount], its licensees, successors and assigns, in perpetuity all of Seller's rights, and interest of every kind, nature, and description throughout the Universe (whether or not such rights, title or interest is now known, recognized or contemplated), if any, and the following 'Elements' (hereinafter called 'the Grant'): . . . (ii) all physical properties and property rights pertaining to each and every Picture; . . . (viii) all rights and property of every kind and nature belonging or pertaining to all of the foregoing, both tangible and intangible, including, but not limited to all copyrights, renewals and extensions of copyrights thereto, and to each and every part thereof."

Paragraph 2 of the agreement provides that the "foregoing Grant" was subject to certain retained rights. First, paragraph 2 (a) provides that plaintiff retained all its rights in certain preexisting licenses "pertaining to exploitation of the Pictures," which plaintiff or its predecessor had granted to local broadcast television stations as licensees:

> "(a) The Grant is subject to certain licenses pertaining to exploitation of the Pictures in existence as of January 1, 1986 between Seller [Feiner Co.] (or certain predecessors of Seller) and third parties (the 'Licenses') specified on Exhibit B annexed hereto. Seller retains all rights in and to such Licenses and all proceeds therefrom (subject to paragraph 3 [a] [xiv] below) except that upon the expiration or sooner termination of any License, all rights granted thereunder shall revert to Purchaser including, without limitation, all rights to and rights of access to, any Film Materials subject to any such expired or terminated License."

The markets in which the licensees under the local Licenses operated were as follows: Altoona, Atlanta, Binghamton, Boston, Buffalo, Chicago, Cincinnati, Columbus, Cleveland, Dayton, Detroit, Fresno, Hartford-New Haven, Indianapolis, Los Angeles, Milwaukee, New York City, Philadelphia, Lebanon, Pa., Toledo and Washington, D.C.

Second, pursuant to paragraph 2 (b) (vi) of the agreement, the grant of rights also excluded certain rights "reserved" by plaintiff, namely the right to exhibit, distribute and otherwise exploit the 17 pictures in certain languages in Germany, Austria, Switzerland, Lichtenstein, and Luxembourg. Likewise, paragraph 2 (b) of the agreement provides that defendant "shall have no interest therein or claim thereon." No other geographic market is reserved to plaintiff, in either paragraph 2 or any other provision of the agreement.

Defendant and its predecessors have exploited the 17 pictures for approximately 25 years. On June 6, 2007, however, plaintiff filed a demand for mediation before the American Arbitration Association, claiming that defendant had breached the agreement by "exploiting" the pictures in "territories" which were reserved by plaintiff. In a separate agreement dated November 1, 2007, the parties agreed to waive the agreement's arbitration provision so as to allow plaintiff to pursue this action in a New York court.

A year and a half later, in a complaint dated July 29, 2009, plaintiff alleges that, under the agreement, it retained rights in the Licenses which "concern exhibitions of the subject motion pictures on television . . . in the designated markets, with plaintiff never having alienated its retained rights in and to television exhibitions in th[o]se markets" reserved by plaintiff. Plaintiff alleges that, since on or before January 1, 2001, defendant, without plaintiff's consent and in violation of plaintiff's retained rights under the agreement, had either directly or through third parties, "commercially exhibited, continues to exhibit and likely will keep on exhibiting the seventeen motion pictures in the above markets without accounting to plaintiff for their exhibitions or paying plaintiff a licensing fee for such exhibitions."

On or about May 14, 2010, defendant moved for summary judgment dismissing the complaint based on documentary evidence. In support, defendant submitted the affidavit of its executive vice-president, business and legal affairs, Mary Luppi Basich, who avers that she conducted and supervised a review of Paramount's records, and that her search revealed that Paramount had not collected any royalties, fees, payments or proceeds of any kind from the Licenses between June 6, 2001 and May 13, 2010.

Plaintiff cross-moved for summary judgment on its breach of contract claim.* In support of its motion, plaintiff submitted the affidavit of its president and majority shareholder, Richard Feiner, who asserts that approximately four or five years ago, he noticed that some of the pictures were being shown on television, which prompted him to conduct a search of television program guides and the Internet, which revealed that the pictures were being exhibited in cities nationwide. Feiner annexes a list showing the networks (including American Movie Classics and Turner Classic Movies) and broadcast playdates for some of the pictures between September 12, 2002 and December 14, 2006. He avers that he knew from his experience in the industry that the pictures exhibited in New York were exhibited nationally, and "obviously are being shown in those cities whose markets my company has reserved rights under the licenses," many of which are reserved in perpetuity.

Feiner further claims that defendant had entered into two "deal memos," with nonparty Rainbow Media Holdings, Inc., dated March 20, 2001 and December 9, 2002, pursuant to which defendant charged fees ranging between $12,000 and $75,000 for exhibition of the pictures listed in the agreement. Feiner argues that the deal memos involved a license to exhibit the pictures, and that the territory for those licenses was the "fifty (50) United States of America." He also argues that the existence of the deal memos directly contradicts Basich's affidavit, in which she claims that defendant had not collected any royalties, fees, payments or proceeds of any kind from the Licenses during the six years preceding commencement of the action.

In opposition to plaintiff's cross motion, defendant submitted a second affidavit of Mary Luppi Basich, who avers that Paramount's entry into "certain national cable licenses to exhibit" the 17 pictures on cable television does not breach the agreement, because the agreement unambiguously provides that plaintiff "retained only the benefit of the performance of the licensees under the Licenses" and "the resultant proceeds." Since defendant has received no royalties, fees or proceeds of any kind from the Licenses since at least June 2001, there could be no breach. She reiterates that her search of defendant's records revealed that Paramount had no record of any protest or complaint for breach by any licensees under the Licenses related to the national cable licenses.

---

* In the complaint, plaintiff also seeks an accounting.

In a decision and order dated April 15, 2011, the IAS court denied both motions. Preliminarily, the court found that defendant established its ownership of the 17 pictures and "its right to use the Pictures." (*Richard Feiner & Co., Inc. v Paramount Pictures Corp.*, 33 Misc 3d 1209[A], 2011 NY Slip Op 51823[U], *3 [2011].) Nevertheless, the court found that summary judgment was precluded because the documentary evidence raised factual issues as to whether defendant's national cable licenses "involved proceeds or royalties paid to Paramount for the exhibition of the Pictures and whether those exhibitions constitute a breach of the local broadcast Licenses held by Feiner." (2011 NY Slip Op 51823[U], *7.) Only defendant appeals, and we reverse for the reasons explained below.

The governing principles are familiar. On a motion to dismiss pursuant to CPLR 3211, the court may grant dismissal when " 'documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law' " (*Goldman v Metropolitan Life Ins. Co.*, 5 NY3d 561, 571 [2005], quoting *Held v Kaufman*, 91 NY2d 425, 430-431 [1998]). The initial question for the court on a motion for summary judgment with respect to a contract claim is "whether the contract is unambiguous with respect to the question disputed by the parties" (*International Multifoods Corp. v Commercial Union Ins. Co.*, 309 F3d 76, 83 [2d Cir 2002]). Of course, the matter of whether the contract is ambiguous is a question of law for the court (*Bailey v Fish & Neave*, 8 NY3d 523, 528 [2007]; *Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]).

On this appeal, plaintiff does not dispute defendant's claim that defendant has received no proceeds of any kind "pursuant to the local broadcast Licenses" during the limitations period applicable to plaintiff's claims. Instead, plaintiff claims that, under the agreement, it retained not only the rights in the preexisting local Licenses and any proceeds derived therefrom, but also the exclusive right to exploit the pictures in the markets covered by those Licenses. Defendant, however, argues that plaintiff's breach of contract claim is contrary to the plain and unambiguous language of the agreement.

Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when "read in the context of the entire agreement" (*W.W.W. Assoc.*, 77 NY2d at 163). Accordingly, the intention of the parties to a contract must be ascertained not

from one provision but from the entire instrument (*Paige v Faure*, 229 NY 114, 118 [1920]; *Village of Hamburg v American Ref-Fuel Co. of Niagara*, 284 AD2d 85, 89 [2001], *lv denied* 97 NY2d 603 [2001]; *Readco, Inc. v Marine Midland Bank*, 81 F3d 295, 300 [2d Cir 1996]; *Hudson-Port Ewen Assoc. v Chien Kuo*, 78 NY2d 944, 945 [1991]).

In the present case, the contract, read as a whole to determine its purpose and intent (*see e.g. W.W.W. Assoc.*, 77 NY2d 157), plainly manifests the intention to grant defendant's predecessor the right to exploit the 17 pictures through national cable deals, unimpeded by the Licenses. As noted above, the operative language provides that the "seller . . . sells, grants, assigns and sets over to Purchaser . . . all of Seller's rights, and interest . . . throughout the Universe." This exclusive right to exploit the pictures worldwide was subject to certain expressed limitations. First, as delineated under paragraph 2 (b), the worldwide grant excluded the rights retained by plaintiff to exploit the pictures in certain languages in a limited number of European national markets. Second, as delineated under paragraph 2 (a), the worldwide grant was subject to certain licenses that plaintiff had granted to certain local broadcast television stations for exclusive broadcast rights to the pictures.

Contrary to plaintiff's allegations, we do not read the retained rights in the preexisting local Licenses as establishing the exclusive right to exploit the pictures in the markets covered by those Licenses. On the contrary, a plain reading of paragraph 2 (a) establishes that plaintiff retained only the benefit of the performance of the licenses, namely the proceeds, if any, defendants received as a result of the exploitations of the pictures by the local Licenses. The agreement, on its face, does not manifestly reserve to plaintiff any right to exploit the pictures in the national cable markets, or to collect proceeds from defendant's exploitation of its rights in the 17 pictures.

Indeed, a contrary reading would be inconsistent with paragraph 2 (a)'s reversion provision. That provision states that the rights under the Licenses "shall revert to Purchaser" upon expiration or sooner termination of the Licenses. Thus, exhibition rights granted under the Licenses belong to either the licensee, while a License is in effect, or defendant, under the reversion clause. Either way, plaintiff itself has no exhibition rights in any U.S. market.

Further support for the plain reading of paragraph 2 (a) emerges from the juxtaposition of paragraph 2 (a) with

paragraph 2 (b). " '[s]ingle clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part' " (*Analisa Salon, Ltd. v Elide Props., LLC*, 30 AD3d 448, 448-449 [2006], quoting *Aimco Chelsea Land v Bassey*, 6 AD3d 367, 368 [2004]). In paragraph 2 (b), the agreement expressly reserved to plaintiff the right to exploit certain European markets. This demonstrates that when the parties exempted a market from the agreement's broad grant, they did so explicitly. Yet, the agreement contains no similar geographical exclusive right to exploit the 17 pictures in any U.S. market covered by those Licenses.

Finally, the plain reading of paragraph 2 (a) is also consistent with another provision in the agreement. Specifically, the agreement contains a Copyright Assignment, which was filed with the Copyright Office, that conveyed to Paramount's predecessor "all of [plaintiff's] rights, title and interest of every kind . . . in and to [the Pictures]" except for the so-called "Reserved Rights." The "Reserved Rights" in the Copyright Assignment are identical to those "reserved" in paragraph 2 (b) of the agreement itself (including the reservation of the European exhibition rights as described above). The Copyright Assignment makes no mention of exhibition rights in the domestic markets. Certainly, if the parties intended to "reserve" exhibition rights in any U.S. market to plaintiff, they would have so stated in the publicly filed record of their copyright conveyance. Thus, the use of the word "solely" in paragraph 2 (b) (vi) of the agreement, and the limited "Reserved Rights" noted in the Copyright Assignment, further confirm that the parties did not provide for the reservation of rights in any market other than the specified European territories.

Accordingly, the order of the Supreme Court, New York County (Paul Wooten, J.), entered April 15, 2011, which, insofar as appealed from, denied defendants' motion for summary judgment dismissing the complaint based on documentary evidence, should be reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

MAZZARELLI, J.P., FRIEDMAN, CATTERSON and DEGRASSE, JJ., concur.

Order, Supreme Court, New York County, entered April 15, 2011, reversed, on the law, without costs, and the motion

granted. The Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.