DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**WELLS FARGO BANK, N.A.,** as Trustee for the **REGISTERED HOLDERS** of **J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2003-PMI,** by and through its special servicer, **ORIX CAPITAL MARKETS, LLC,**
Appellants,

v.

**PALM BEACH MALL, LLC,** a Delaware Limited Liability Company; **SIMON PROPERTY GROUP, L.P.,** a Delaware Limited Partnership, also known as **SIMON PROPERTY GROUP, L.P.,** a Delaware Limited Partnership doing business as **DeBARTOLO REALTY PARTNERSHIP, LTD.; and SIMON PALM BEACH, LLC,** a Delaware Limited Liability Company,
Appellees.

Nos. 4D13-4808 and 4D14-24

[September 30, 2015]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Meenu Sasser, Judge; L.T. Case No. 502009 CA013088XX.

Matthew R. Chait, Alfred A. LaSorte, Jr., and Jonathan P. Hart of Shutts & Bowen LLP, West Palm Beach; Jessica L. Ellsworth and Neal Kumar Katyal of Hogan Lovells US LLP, Washington, D.C.; and Ira M. Feinberg of Hogan Lovells US LLP, New York, NY, for appellants.

David P. Ackerman of Ackerman, Link & Sartory, West Palm Beach, and Paul Vizcarrondo and Ben M. Germana of Wachtell, Lipton, Rosen & Katz, New York, NY, for appellees.

PER CURIAM.

Appellant Wells Fargo Bank, N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2003-PMI, by and through its special servicer Orix Capital Markets, LLC ("Wells Fargo"), appeals four

separate orders in favor of appellees Palm Beach Mall, LLC ("PBM"), Simon Property Group, L.P., also known as Simon Property Group, L.P., doing business as DeBartolo Realty Partnership, LTD., and Simon Palm Beach, L.L.C. (collectively, "Simon"). This case concerns PBM and Simon's liability to Wells Fargo in light of PBM's alleged breach of certain provisions of an agreement initially executed by PBM and JP Morgan Chase Bank ("JP Morgan"). Wells Fargo raises multiple issues on appeal. We affirm the judgment of the trial court in all respects.

## The Loan Documents

In the mid-1990s, Simon acquired the Palm Beach Mall (the "Mall") and subsequently created PBM as a limited liability company ("LLC") for the sole purpose of owning and operating the property. The terms of the LLC agreement named Simon as an equity member of PBM and expressly permitted, but did not require, members to make capital contributions to PBM.

In September of 2002, JP Morgan issued a loan to PBM in the amount of $55,350,000. The loan was secured by a mortgage, which was later assigned to Wells Fargo on October 23, 2003. Prior to the assignment, JP Morgan also entered into a loan agreement (the "Loan Agreement") with PBM, and a guaranty agreement (the "Guaranty") with Simon, both of which are governed by New York law.

In the Loan Agreement, PBM pledged to maintain the status of a "special purpose entity," defined in pertinent part as follows:

> "Special Purpose Entity" shall mean a corporation, limited partnership or limited liability company which at all times prior to, and on and after, the date hereof:
>
> . . . .
>
> (i) is and will remain *solvent* and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) *from its assets as the same shall become due*, and is maintaining and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;
>
> . . . .

2

(q) has paid and will pay *its own liabilities and expenses*, including the salaries of its own employees, *out of its own funds and assets*, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations[.]

(Emphasis added).

PBM also acknowledged that JP Morgan had "a valid interest in maintaining the value of [the Mall] so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the obligations contained in the Loan Documents, Lender can recover the Debt by a sale of [the Mall]."[1]  Finally, the Loan Agreement contained the following exculpation provision:

> Section 9.4.  <u>Exculpation</u>.  Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; <u>provided</u>, <u>however</u>, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower or its members, partners, officers, directors, employees or agents (collectively, the "Exculpated Parties") in any such action or proceeding under, or by reason of, or in connection with, the Note, this

---

[1] PBM is referred to as "Borrower" throughout the Loan Agreement.

Agreement, the Mortgage or the other Loan Documents.[2] *The provisions of this Section shall not, however . . . (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, but not against any Exculpated Party, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following*:

. . . .

    (ii) *the gross negligence or willful misconduct of Borrower*[.]

. . . .

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents . . . (B) *the Debt shall be fully recourse to Borrower, but not to any Exculpated Party . . .* (iii) *if Borrower fails to maintain its status as a Special Purpose Entity . . . .*

(Emphasis added).

Thus, under the terms of the Loan Agreement, PBM was liable to JP Morgan for "any loss, damage, cost, expense, liability, claim or other obligation . . . arising out of or in connection with . . . [its own] gross negligence or willful misconduct." Additionally, in the event PBM failed to maintain its status as a "special purpose entity" as defined in the Loan Agreement, the loan would become a full recourse loan.[3]

According to the provisions of the Guaranty, Simon agreed to pay certain obligations and liabilities owed by PBM under the terms of the Loan Agreement in the event PBM defaulted or engaged in certain proscribed actions. Specifically, the Guaranty stated:

---

[2] Because Simon was listed as an equity member of PBM in the LLC agreement, it is, under the terms of the Loan Agreement, an "exculpated party."

[3] A recourse loan is defined as "[a] loan that allows the lender, if the borrower defaults, not only to attach the collateral but also to seek judgment against the borrower's (or guarantor's) personal assets." Black's Law Dictionary 1021 (9th ed. 2009).

NATURE AND SCOPE OF GUARANTY

1.1 <u>Guaranty of Obligation</u>. Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

1.2 <u>Definition of Guaranteed Obligations</u>. As used herein, the term "Guaranteed Obligations" means (a) the obligations and liabilities of Borrower[4] to Lender *for any loss, damage, cost, expense, liability, claim and any other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following*:

. . . .

   (ii) *the gross negligence or willful misconduct of Borrower*[.]

. . . .

(b) *the entire amount of the Debt . . . (iii) if Borrower fails to maintain its status as a Single Purpose Entity . . . .*

(Emphasis added).

Thus, according to the Guaranty, Simon was liable for any loss incurred as a result of PBM's gross negligence or willful misconduct, and for the entire amount of any outstanding debt owed by PBM if PBM failed to maintain its status as a "single purpose entity," rather than a "special purpose entity" as indicated in the Loan Agreement.

---

[4] PBM is referred to as "Borrower" throughout the Guaranty as well.

## PBM's Management of the Mall

In August 2003, Midland Loan Services ("Midland") became the servicer for PBM's loan. As servicer, Midland conducted regular annual inspections of the Mall property to make sure that the collateral (the Mall property) was in the same physical shape from year to year. Midland's reports show that the Mall was in "good" condition from 2004-2007, "fair" condition in March 2009, and "average" condition in April 2009. In May 2009, a separate property condition report prepared by EBI Consulting on behalf of Wells Fargo indicates that the Mall appeared to be in "good" condition at that time.

Midland's reports also reflect that in 2007 Simon undertook plans to redevelop the Mall and attract new tenants to increase its competition with other retail stores in the area. From 2007 to 2009 Simon made payments of over $2,000,000 to PBM[5] and also engaged in a practice known as "de-leasing"[6] to avoid negotiating lease buyouts once the redevelopment process began.

During the economic downturn between 2007 and 2009, many tenants left the Mall. For example, Macy's closed its doors in January 2009, stating that the decision to leave was made for economic reasons and not because of the planned redevelopment. In fact, a Macy's representative testified that the redevelopment plans were a reason why the store remained open at the Mall until 2009. In another example IKEA, which had been participating in negotiations to open a location at the Mall, cited the poor economy as the reason for withdrawing from those plans. According to appellees, the financial crisis and the loss of tenants caused their redevelopment plans to fall apart. This is corroborated by a December 2009 asset status report prepared by Orix Capital Markets, LLC ("Orix"), which took over as servicer from Midland. In the report, Orix stated that Simon spent approximately $1,200,000 pursuing redevelopment plans, which eventually stalled out along with the economy.

In March 2009, PBM defaulted on its loan. According to the deposition testimony of David Simon, the chairman and chief executive officer ("CEO")

---

[5] Reports prepared by Ernst and Young show that PBM operated at a loss during 2007 and 2008 and correspondence among Simon employees show that PBM received these funds from Simon during this time.

[6] The practice of "de-leasing" involves intentionally declining to extend new leases to tenants and limiting the terms of existing leases in anticipation of planned redevelopment.

of Simon, Simon could not keep the Mall leased because the property was unable to sustain itself. As such, he made the decision to transfer the deed to the Mall to Wells Fargo.

To dispute appellees' claim that they were attempting to redevelop the Mall during the global recession, Wells Fargo asserted that the Mall's failure was due to PBM's mismanagement. Specifically, Wells Fargo claimed that: 1) the redevelopment plans never "got past the development stages" (a point conceded by Simon); 2) as part of the "de-leasing" process, appellees intentionally offered month-to-month leases, allowed tenants to terminate leases without contractually-required cancellation fees, and replaced large national chain tenants with local "mom-and-pop" stores on short-term leases; 3) appellees allowed a rodent problem to develop in various locations in the food court; 4) appellees never obtained the approval or financing required to make the IKEA deal a reality; and 5) Simon removed all of its signage from the property because it no longer wanted its "brand" associated with the Mall.

## The Proceedings Below

After PBM's default, Wells Fargo filed a four-count foreclosure action and subsequently bought the Mall at auction. Following the purchase, Wells Fargo sold the property for $25,000,000.[7]

Proceeding on its causes of action apart from foreclosure, Wells Fargo claimed under Count I that PBM breached the Loan Agreement by engaging in gross negligence or willful misconduct in its management of the Mall that caused Wells Fargo to suffer a loss. Specifically, Wells Fargo alleged that PBM drove out tenants, operated the mall at a sub-standard level, withheld details concerning the planned redevelopment, intentionally destroyed the property, and violated various covenants from the mortgage and Loan Agreement which amounted to a reckless disregard for Wells Fargo's rights and interest in preserving the Mall property. According to Wells Fargo, these actions, along with the deferral of routine maintenance, the "de-leasing" process, and the failure to follow through on the redevelopment of the Mall, amounted to gross negligence and/or willful misconduct which entitled it to a money judgment under section 9.4 of the Loan Agreement.

---

[7] Both parties agreed that any money judgment rendered in favor of Wells Fargo should be reduced by this amount.

In Count II, Wells Fargo argued that, pursuant to section 1.2(a) of the Guaranty, Simon was liable for PBM's alleged negligence or willful misconduct described under Count I.

In Count III, Wells Fargo claimed a breach of the contractual requirement that PBM maintain its status as a "special purpose entity" by remaining solvent, as described in section (i) of the "special purpose entity" covenant. Further, Wells Fargo argued that PBM breached subsection (q) of the "special purpose entity" covenant because PBM began receiving money from Simon in 2007, and was thus paying its liabilities and expenses from sources other than its own funds and assets.

Finally, in Count IV, Wells Fargo claimed that PBM failed to maintain its status as a "single purpose entity," rendering Simon liable under the Guaranty for the entire outstanding amount of the debt owed by PBM.

In January 2013, Wells Fargo filed a motion seeking summary judgment on Count III and Count IV, and appellees responded by filing a competing motion for summary judgment on all four counts. In November 2013, the trial court issued an order denying Wells Fargo's motion but granting appellees' motion for summary judgment on Count I and Count II. As it pertained to the allegations of PBM's gross negligence and willful misconduct in its management of the Mall in those counts, the trial court held that Wells Fargo's arguments failed "as a matter of law based on New York cases which have interpreted the terms gross negligence and willful misconduct in the context of a liability-limitation provision to entail a deliberate act beyond a party acting out of its economic self-interest." Therefore, there were no genuine issues of material fact to show that appellees' "actions [were] the type of conduct that would overcome the broad protection afforded by the exculpation provision in the Loan Agreement."

For Count III, the trial court denied summary judgment and found that Wells Fargo did not show an absence of material fact pertaining to PBM's alleged failure to remain solvent, and that Wells Fargo's claim pertaining to the legal significance of Simon's infusions of cash into PBM was unpersuasive.

Regarding Count IV, Wells Fargo argued that the term "single" should be read as "special," thus subjecting Simon to liability for PBM's failure to maintain "special purpose entity" status as defined in the Loan Agreement. The trial court noted that the language of the Guaranty rendered Simon liable only for PBM's failure to maintain status as a "single purpose entity,"

and that Wells Fargo had "repeatedly stated it sought plain language enforcement of the Loan Agreement and accompanying Guaranty," characterizing the discrepancy between the use of the terms "special" and "single" as unimportant and as a typographical error. According to the court, Wells Fargo was seeking, "without outright requesting, that the Court reform the Guaranty to match the term in the Loan Agreement." On this point, the trial court found that Wells Fargo failed to meet the high burden for reformation under New York law, and that Wells Fargo's arguments were "unpersuasive in light of the language of the documents memorializing the loan, the evidence of the parties' intent, and the sophistication of the parties to the agreement."

Additionally, the court noted that under Count IV Wells Fargo claimed that the use of the term "single" was a scrivener's error, stating:

> [Wells Fargo] requests the Court proceed as if this was a scrivener's error, ignore the plain language of the contract, and yet simultaneously assert it is not seeking a reformation of the contract. These positions are inconsistent and unavailing in light of the clear language of the contract and the evidence submitted by [appellees].
>
> Indeed, according to the parties involved in negotiating the Loan Agreement and Guaranty, *an event in which* [*Wells Fargo*] *was not involved*, the parties understood these terms to have distinct meanings. . . . In addition to the evidence of intent of the parties to the Loan Agreement and Guaranty, the usage and custom in the commercial lending industry of the term "special purpose entity" and "single purpose entity" shows that [Wells Fargo's] argument is untenable. In light of the sophistication of the parties who entered into the Loan Agreement and the Guaranty, the Court finds that the parties knew these terms to have distinct meanings, and negotiated the risk accordingly.

(Emphasis added).

After the trial court issued this order, appellees filed a motion for reconsideration pertaining to Count IV. Upon reconsideration, the trial court issued an order granting summary judgment on Count IV in appellees' favor, based upon the analysis contained in its previous order.

At trial on the sole remaining count, Count III, Wells Fargo presented the testimony of an expert appraiser who stated that, as of December 31, 2008, the Mall's market value had dropped to $14,700,000. It also presented the testimony of an expert accountant who stated that, based on this figure, PBM's liabilities exceeded its assets by $36,024,277 using a market value basis as of that date. Wells Fargo argued that under a definition of solvency known as "balance-sheet insolvency," found in both Federal Bankruptcy law and the Uniform Commercial Code ("U.C.C."), PBM was insolvent because PBM's liabilities exceeded its assets. As a result, it failed to fulfill its contractual obligation to maintain its status as a "special purpose entity," rendering the outstanding debt fully recourse against PBM.

At the close of Wells Fargo's case, appellees moved for involuntary dismissal pursuant to Florida Rule of Civil Procedure 1.420(b). Appellees argued that Wells Fargo had not offered any evidence that in order to remain "solvent," as described in the Loan Agreement, PBM's assets must exceed its liabilities. Rather, they maintained that because "solvent" and "insolvent" were not defined in the Loan Agreement, New York law required that the court apply the New York common law definition of insolvency known as "equity insolvency," meaning "the inability to pay debts and obligations as they become due in the regular course of business." The trial court agreed with appellees and dismissed Count III, rejecting Wells Fargo's balance-sheet definition of insolvency for two reasons:

> *First,* if the parties to the Loan Agreement intended for the UCC definition of "insolvent" to apply, the parties would have referenced the UCC in the relevant section of the Loan Agreement. Likewise, if the parties to the Loan Agreement intended for the bankruptcy law definition of "insolvent" to apply, they would have referenced the bankruptcy law in the relevant section of the Loan Agreement. That the bankruptcy law is mentioned elsewhere in the Loan Agreement but is not mentioned in the relevant section at issue before the Court cuts against plaintiff's interpretation.

> *Second,* as a matter of New York law, Article 9 of the UCC, by its terms, does not apply to "transactions involving real property." *See Hawkins-El III* v. *AJG Sav. Bank,* 2006 WL 2008573, at *7 (E.D.N.Y. July 13, 2006) ("[T]he UCC is inapplicable as it does not cover transactions involving real property."); *In re Churchill Mortg. Inv. Corp.,* 233 B.R. 61, 70 (Bankr. S.D.N.Y. 1999) ("[T]he UCC does not apply to security

10

interests in real estate . . . ."); N.Y. U.C.C. § 9-109(d)(ll). Simply put, as a matter of law, the UCC does not apply in these circumstances.

As a result, the trial court rendered final judgment for appellees. This appeal ensued.

## Analysis

On appeal, Wells Fargo raises issues relating to each count alleged in its complaint.

On Counts I and II, Wells Fargo claims that the trial court erred by granting summary judgment in favor of appellees because it presented undisputed evidence from which a reasonable finder of fact could have concluded that PBM acted with reckless or deliberate disregard for Wells Fargo's rights in the Mall. Specifically, Wells Fargo contends that even if PBM was acting in its own economic interest, it was not immunized from liability under New York law.

On Count III, Wells Fargo maintains that the trial court erred by rejecting its balance-sheet insolvency definition and granting appellees' motion for involuntary dismissal. Moreover, Wells Fargo claims that the trial court should have granted its initial motion for summary judgment on Count III because PBM breached the "special purpose entity" covenant in the Loan Agreement by using the funds from Simon to pay its debt on the loan.

On Count IV, Wells Fargo argues that the trial court again misapplied New York law by granting appellees' motion for summary judgment. Wells Fargo asserts that because the Loan Agreement and the Guaranty were executed as part of the same transaction, they must be read as one, and the term "single purpose entity" in the Guaranty should have been interpreted to have the same definition as "special purpose entity" in the Loan Agreement.

We address each issue in turn.

### a. Count I and Count II

This court reviews orders granting summary judgment de novo. *Dennis v. Kline*, 120 So. 3d 11, 20 (Fla. 4th DCA 2013).

When reviewing a ruling on summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party. If the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper.

*Id.* (citations and quotations omitted).

As discussed above, section 9.4(ii) of the Loan Agreement makes PBM liable to Wells Fargo only for losses "arising out of or in connection with" PBM's "gross negligence or willful misconduct" in its management of the Mall. Likewise, section 1.2(a) of the Guaranty renders Simon liable for losses incurred as a result of PBM's "gross negligence or willful misconduct."

The trial court relied upon the New York Court of Appeals' decision in *Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc.* (*MetLife*), 84 N.Y.2d 430 (N.Y. 1994), for granting summary judgment in favor of appellees on Count I and Count II. Wells Fargo claims that the trial court misread this case and erred by relying on it to hold that gross negligence and willful misconduct, in the context of a liability-limitation provision, requires a deliberate act beyond a party merely acting out of its economic self-interest.

*MetLife* involved a dispute over a provision in a contract that absolved the defendant from liability "resulting from . . . performance or *nonperformance*," but made the defendant liable "for *intentional misrepresentations*, or damages arising out of [defendant's] *willful acts or gross negligence*." *Id.* at 433 (alteration in original). After the defendant began performing under the contract, it "demanded an upward adjustment of the contract ceiling for enhancements, failing which it announced it would withdraw from the project." *Id.* The plaintiff refused the defendant's demand, and the defendant ceased "further performance." *Id.*

The New York trial court excluded "merely deliberate or intentional nonperformance" from the definition of willful act when instructing the jury, over the plaintiff's objection. *Id.* at 434. The jury then found that the "defendant's acts were willful and awarded [the] plaintiff $3,961,000 in damages." *Id.* The Appellate Division reduced this award to $204,000, and "interpreted the willful act exception to the limitation of liability provision in the contract as requiring acts constituting the commission of a tort." *Id.* The court stated that, "as a matter of law . . . the proof did not

establish any such tortious conduct, but merely an intentional abandonment which [it] held insufficient to invoke the exception." *Id.* The plaintiff appealed, arguing that the Appellate Division "erred in refusing to attribute the common, ordinary meaning of willful acts as merely deliberate or intentional conduct." *Id.* at 434-35.

The New York Court of Appeals framed the issue as follows:

> The issue here is not how we and other courts have construed "willful" in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law. Rather, the issue is what the parties intended by "willful acts" as an exception to their contractual provision limiting defendant's liability for consequential damages arising from its "non-performance under this agreement". Thus, to the extent that the Appellate Division opinion holds that tort law principles apply in all cases in which the word willful is at issue or thereby limits the legal meaning of the word, we do not agree. However, because the law of contracts as pertinent and applied to this contractual dispute leads us to the same result, we now affirm.

*Id.* at 435.

The court noted that "[g]enerally in the law of contract damages, as contrasted with damages in tort, whether the breaching party deliberately rather than inadvertently failed to perform contractual obligations should not affect the measure of damages." *Id.* The court ultimately held:

> In excepting willful acts from defendant's general immunity from liability for consequential damages under section 7 of the Agreement, we think the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest. Under the interpretation tool of *ejusdem generis* applicable to contracts as well as statutes, *the phrase "willful acts" should be interpreted here as referring to conduct similar in nature to the "intentional misrepresentation" and "gross negligence" with which it was joined as exceptions to defendant's general immunity from liability for consequential damages* (*see, Bers v. Erie R.R. Co.,* 225 N.Y. 543, 546, 122 N.E. 456[, 457 (1919)]; *Krulewitch v. National Importing & Trading Co.,* 195 A.D. 544, 546,186

13

N.Y.S. 838[, 839 (1921)]). We, therefore, conclude that the term willful acts as used in this contract was intended by the parties to subsume conduct which is tortious in nature, i.e., *wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties.*

*Id.* at 438 (emphasis added).

Like the contract provision at issue in *MetLife*, the relevant portions of section 9.4(g)(ii) of the Loan Agreement and section 1.2(a)(ii) of the Guaranty join "willful conduct" and "gross negligence." Therefore, the trial court was correct in interpreting this case to mean that appellees would be liable only if PBM performed deliberate acts beyond acting out of its economic self-interest. Examining the record "in the light most favorable" to Wells Fargo, as we must, *Dennis,* 120 So. 3d at 20, it is clear the court did not err by finding that appellees were not engaged in such deliberate acts.

Wells Fargo also claims that the trial court erred in granting summary judgment to appellees on Count I and Count II because it raised triable questions of fact regarding the reasonableness of the "de-leasing" and "de-hancing"[8] of the Mall in the midst of an economic crisis, and whether this strategy was grossly negligent in light of Wells Fargo's rights in the Mall as collateral. Specifically, Wells Fargo argues that appellees intentionally "de-hanced" the property by failing to make repairs and conduct certain maintenance, and intentionally "de-leased" the property. It also cites the rodent problem as evidence that PBM failed to properly sanitize the Mall. Wells Fargo maintains that these actions constituted grossly negligent conduct, again rendering the outstanding debt fully recourse against PBM.

In *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384-85 (N.Y. 1983), the New York Court of Appeals established the standard for a finding of gross negligence under an exculpatory clause. The court stated:

But an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts

---

[8] It appears Wells Fargo intends to use this word to be akin to "de-enhancement," or the reverse of "enhancement," by implying that affirmative steps were taken for the purpose of degrading and diminishing the Mall property.

(cf., e.g., *Gross v Sweet,* 49 N.Y.2d 102, 106[, 400 N.E.2d 306, 308 (N.Y. 1979)], with *Ciofalo v Vic Tanney Gyms,* 10 N.Y.2d 294, 297[, 177 N.E.2d 925, 926 (1961)]; see, generally, 15 Williston, Contracts [3d Jaeger ed.], § 1750A; 5 Corbin, Contracts, § 1068; Restatement, Contracts 2d, § 195).

More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, *it betokens a reckless indifference to the rights of others,* it may be implicit (Matter of *Karp v. Hults,* 12 A.D.2d 718[, 209 N.Y.S.2d 128 (1960)], affd 9 N.Y.2d 857[, 175 N.E.2d 465 N.Y. (1961)]).

*Id.* at 384-85 (emphasis added) (footnotes omitted).

The record, viewed in the light most favorable to Wells Fargo, reflects that appellees "de-leased" the Mall and delayed repairs in anticipation of a planned redevelopment. Even the correspondence among PBM and Simon's employees cited by Wells Fargo in support of its argument suggests that a redevelopment plan was being contemplated. As such, Wells Fargo has not shown that appellees' actions amounted to "a reckless indifference to the rights of others." *Id.* Additionally, while the Mall may have had rodents in certain areas of the food court at one point in time, the record does not support Wells Fargo's contention that this was a result of appellees' "reckless indifference" to its rights, as described by the New York Court of Appeals in *Kalisch-Jarcho.* *Id.*

### b. Count III

We review the trial court's ruling on a motion for involuntary dismissal pursuant to rule 1.420(b) de novo. *Deutsche Bank Nat'l Trust Co. v. Huber,* 137 So. 3d 562, 563 (Fla. 4th DCA 2014).

### i.    The Definition of Insolvency

Wells Fargo next argues that the trial court erred by rejecting the balance-sheet insolvency definition in favor of equity insolvency. Balance-sheet insolvency is defined as "[i]nsolvency created *when the debtor's liabilities exceed its assets.*" Black's Law Dictionary 867 (9th ed. 2009)

(emphasis added). This definition has been adopted by the Federal Bankruptcy Code, *see* 11 U.S.C. § 101(32)(A) (defining insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property"), and by New York's version of the U.C.C. then in effect, as one of three possible definitions. *See* N.Y. U.C.C. Law § 1-201(23) (McKinney 2013) (stating that "[a] person is 'insolvent' who either has ceased to pay his debts in the ordinary course of business *or* cannot pay his debts as they become due *or is insolvent within the meaning of the federal bankruptcy law*") (emphasis added).

In contrast, equity insolvency is defined as "[i]nsolvency created when the debtor cannot meet its obligations *as they fall due.*" Black's Law Dictionary 867 (9th ed. 2009) (emphasis added); *see also* N.Y. U.C.C. § 1-201(23) (listing the inability to "pay [one's] debts as they become due" as one of three definitions of insolvency).

The common law test for insolvency in New York is defined as "'whether there is a general inability on the part of the debtor *to pay its obligations as they become due* in the regular course of business.'" *Silsby v. Icahn*, 17 F. Supp. 3d 348, 361 n.2 (S.D.N.Y. 2014) (emphasis added) (quoting *In re Comp III, Inc.,* 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992)); *see also In re Gordon Car & Truck Rental, Inc.*, 59 B.R. 956, 960 (Bankr. N.D.N.Y. 1985) (quoting *Abrams v. Manhattan Consumers Brewing Co.*, 126 N.Y.S. 844, 846 (App. Div. 1911), for same proposition); *Am. Castype Corp. v. Niles-Bement-Pond Co.*, 42 N.Y.S.2d 638, 639 (App. Div. 1943) (citing *Brouwer v. Harbeck*, 9 N.Y. 589, 594 (1854) (stating that "[u]nder our common law 'insolvent' means inability to meet obligations as they mature in the ordinary course of business"). In other words, New York's common law definition of insolvency is the same as the definition of equity insolvency. In fact, Wells Fargo even conceded at trial that equity insolvency was the common law definition of insolvency in New York.

In *In re Gordon Car & Truck Rental, Inc.*, the Federal Bankruptcy court for the Northern District of New York was faced with the question of whether to apply the balance-sheet definition or the New York common law definition of insolvency in a contract dispute. 59 B.R. at 960. The court noted that "[t]here is no sound answer to the question of which insolvency test should be applied," and cited *American Castype Corp.* for the proposition that "the meaning of 'insolvent' [is] a question of law" for the court to decide. *Id.* (citing *Am. Castype Corp.*, 42 N.Y.S.2d at 639). The court ultimately held that, in the absence of a statutory provision requiring application of one of the two definitions, the New York common law definition of insolvency controls. *Id.* at 961. In the instant case, as in

*In re Gordon*, "neither party [has] cite[d to] any statutory provision[] which require[s] application of either insolvency test." *Id.* As such, the trial court was correct in concluding that the equity insolvency definition controls.

Despite this, Wells Fargo maintains that the trial court should have adopted the balance-sheet definition of insolvency because, when the equity insolvency definition is used, several provisions of the Loan Agreement are rendered meaningless, redundant, and superfluous. As mentioned above, subsection (i) of the "special purpose entity" covenant states, in pertinent part, that PBM:

> *is and will remain solvent* and *pay its debts and liabilities . . . from its assets as the same shall become due*, and is *maintaining and will maintain adequate capital* for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations[.]

(Emphasis added).

Wells Fargo argues: 1) that if the equity insolvency definition is used, the second and third italicized portions of subsection (i) become redundant; and 2) that the equity insolvency definition also renders section 9.4(B)(i)(e) of the Loan Agreement and section 1.2(b)(i)(E) of the Guaranty superfluous and meaningless. Section 9.4(B)(i)(e) contemplates the consequences of PBM declaring bankruptcy, and states, in pertinent part, that the debt will become fully recourse against PBM, but not as to an exculpated party (i.e. Simon), "in the event of . . . [PBM] admitting, in writing or in any legal proceeding, its *insolvency or inability to pay its debts as they become due.*" (emphasis added). Section 1.2(b)(i)(E) also contemplates the consequences of PBM declaring bankruptcy, and states that Simon will be liable for the full amount of the debt in the event that PBM "admit[s], in writing or in any legal proceeding, its *insolvency or inability to pay its debts as they become due.*" (emphasis added).

Notwithstanding the New York cases cited above which hold that the equity insolvency definition applies in situations such as the one presented in the instant case, Wells Fargo has not shown how this purported redundancy renders these provisions of the Loan Agreement and the Guaranty meaningless or inconsistent.[9] Moreover, while it is true that

---

[9] Wells Fargo cites to *Lawyers' Fund for Client Protection of the State of N.Y. v. Bank Leumi Trust Co. of N.Y.*, 727 N.E.2d 563 (N.Y. 2000), to support its

"[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible," *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003)) (applying New York law), adopting Wells Fargo's proposed balance-sheet definition of insolvency may have a serious and deleterious effect on the commercial mortgage-backed securities market.

Applying the balance-sheet insolvency definition as Wells Fargo proposes would allow a lender to accelerate a loan balance, foreclose, and sue for a deficiency any time the market value of a collateral property, along with the value of the borrower's other assets, slips below the value of the borrower's liabilities. However, one can easily imagine a situation where the total market value of a collateral property and other assets drops below that of a borrower's liabilities, but the borrower still is able to make scheduled loan payments from other sources, such as capital contributions from a parent company. In such a situation, a borrower who is current on loan payments, and able to keep making scheduled payments, still would be considered insolvent under Wells Fargo's theory.[10] Regardless, Wells Fargo has not cited to any persuasive authority from New York or elsewhere adopting its balance-sheet insolvency definition to impose recourse liability upon a debtor.

---

argument. There, two provisions in a subrogation contract were at issue. *Id.* at 566. The first provision listed stated that the claimant "subrogates to the Lawyers' Fund for Client Protection, to the extent of the award, all rights, claims, judgments, and causes of action . . . ." *Id.* The second provision began: "Claimant(s) *also subrogates* to the Lawyers' Fund for Client Protection all claims, demands, and causes of action . . . ." *Id.* (emphasis added). The New York Court of Appeals held that the use of the word "also" in the second provision "indicat[ed] that what follows is a separate, additional provision, not merely a reiteration of what came before." *Id.* Based on this case, Wells Fargo argues that because the three phrases italicized above in subsection (i) of the "special purpose entity" covenant are separated by "and," each should be given a distinct meaning, as the two provisions separated by "also" were given in *Lawyers' Fund.* However, while the second provision in *Lawyers' Fund* was clearly intended to subrogate additional things to the Lawyers' Fund for Client Protection by using "also," it is not at all clear that the parties inserted the word "and" between the underlined phrases in subsection (i) in order to incorporate different definitions of "solvent."

[10] As appellees point out, Wells Fargo has not reconciled its proposed interpretation with the realities of commercial transactions.

Wells Fargo alleges two additional errors made by the trial court in its decision to dismiss Count III pursuant to rule 1.420(b).  First, it claims that the trial court erred by engaging in fact-finding before it determined that the term "solvent" had two or more reasonable definitions in the context of the agreement, and was therefore ambiguous.  Wells Fargo maintains that because the parties proposed two distinctly different definitions, under New York law the trial court first had to determine whether one or both definitions were reasonable in the context of the entire agreement.  *Richard Feiner & Co. v. Paramount Pictures Corp.*, 941 N.Y.S.2d 157 (App. Div. 2012) ("Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" (quoting *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990)).

Even though the record reflects that the trial court believed the term "solvent" was ambiguous as used in the contract, this issue has not been preserved for appellate review.  *Sunset Harbour Condo. Ass'n v. Robbins*, 914 So. 2d 925, 928 (Fla. 2005) ("'In order to be preserved for further review by a higher court, an issue must be presented to the lower court and the specific legal argument or ground to be argued on appeal or review must be part of that presentation if it is to be considered preserved.'" (quoting *Tillman v. State*, 471 So. 2d 32, 35 (Fla. 1985))).  We therefore decline to address it further.

Second, Wells Fargo claims that the equity insolvency definition is not the New York common law definition of insolvency.  As discussed above, the definition of equity insolvency from Black's Law Dictionary is nearly identical to the New York common law definition of insolvency.  Moreover, the record reflects that Wells Fargo expressly agreed at trial that this was the correct definition under New York common law.

The trial court did not err by adopting the equity insolvency definition of insolvent.  Under this definition, PBM did not breach subsection (i) of the "special purpose entity" covenant in the Loan Agreement, and neither PBM nor Simon is liable for the outstanding debt owed on the loan.

### ii. Simon's Capital Contributions to PBM

Wells Fargo also claims that the trial court should have granted summary judgment in its favor on Count III because PBM breached the "special purpose entity" covenant in the Loan Agreement by using funds from Simon to pay its debt on the loan.  As stated above, subsection (q) of the "special purpose entity" covenant required PBM to "pay its own

liabilities and expenses . . . out of its own funds and assets." Wells Fargo maintains the trial court erred by categorizing these payments as capital contributions that became part of PBM's funds and assets, and argues that Simon's contributions of $2,000,000 to PBM to allow it to pay its operating expenses, without the expectation of repayment or return, clearly violated the "special purpose entity" covenant.

A capital contribution is defined as "[c]ash, property, or services contributed by partners to a partnership." Black's Law Dictionary 237 (9th ed. 2009). Because Simon was a member of PBM, the trial court was correct in categorizing Simon's outlays to PBM as capital contributions.

Additionally, the record reflects that the funds were accounted for as equity contributions from Simon to PBM, and were given to PBM with the expectation that the planned redevelopment of the Mall would be successful. Although the infusion of cash served to increase Simon's equity in PBM, appellees contend that once the cash capital was received, it became part of PBM's assets. We agree. Wells Fargo has not offered any authority in support of its argument to persuade us to the contrary. *E & I, Inc. v. Excavators, Inc.*, 697 So. 2d 545, 547 (Fla. 4th DCA 1997) ("The appellant has the burden of making 'any reversible error clearly, definitely, and fully appear.'" (quoting *Strate v. Strate*, 328 So. 2d 29, 30 (Fla. 3d DCA 1976))).

As such, PBM did not breach the "special purpose entity" covenant by using these funds to make loan payments or meet other operating expenses.

### c. Count IV

As stated above, section 1.2(b)(iii) of the Guaranty renders Simon liable for the full amount of PBM's debt in the event that PBM failed to maintain its status as a "single purpose entity." Wells Fargo argues that the use of "single purpose entity" in the Guaranty was a mistake, and that this term should either be interpreted to have the same meaning as "special purpose entity" in the Loan Agreement, or that it should be treated as a scrivener's error, and the Guaranty should be reformed to replace the word "single" with "special." Wells Fargo maintains that the two documents must be read as one, and that if "single purpose entity" means something other than "special purpose entity," the transaction would have been patently absurd. It claims that the trial court had the power to reform the Guaranty to correct this "obvious error," and that it erred by refusing to do so.

These arguments are unavailing. First, as the trial court pointed out, Wells Fargo was not a party to the negotiations which gave rise to the loan documents, and as such it is not in a position to argue whether or not the use of "single" rather than "special" in the Guaranty was intentional. Moreover, PBM did not violate the "special purpose entity" covenant in the Loan Agreement. Therefore, even if we agreed with Wells Fargo that "single purpose entity" in the Guaranty should be interpreted to have the same meaning as "special purpose entity" in the Loan Agreement (which we do not), Simon still would not be liable for the outstanding debt.

## Conclusion

Based on the foregoing, we affirm the trial court's summary judgment in favor of appellees on Counts I, II and IV, and affirm its involuntary dismissal of Count III.

*Affirmed.*

CIKLIN, C.J., FORST and KLINGENSMITH, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***